STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
MICHAEL McCLOSKEY, DEFENDANT-APPELLANT.

Argued April 20, 1982—Decided June 28, 1982.

*Joseph J. Benedict* argued the cause for appellant (*Benedict & Altman*, attorneys).

*Victoria Curtis Bramson*, Deputy Attorney General, argued the cause for. respondent (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney).

*Andrea R. Grundfest*, Assistant Deputy Public Defender, argued the cause for *amicus curiae* Office of the Public Defender (*Stanley C. Van Ness*, Public Defender, attorney).

The opinion of the Court was delivered by

PASHMAN, J.

Defendant Michael McCloskey was convicted of second degree murder, *N.J.S.A.* 2A:113–2, murder while armed, *N.J.S.A.* 2A:151–5, unlawful possession of a knife, *N.J.S.A.* 2A:151–41(c), and unlawful use of a dangerous weapon, *N.J.S.A.* 2A:151–56. The Appellate Division affirmed the conviction. We granted certification limited to the issue of whether the use at trial of incriminating statements made by the defendant during police interrogation violated his Fifth and Fourteenth Amendment rights under *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966). 88 *N.J.* 501 (1981). We now reverse.

## I

Defendant McCloskey was arrested by state police while fleeing the scene after a knife fight at T's Zodiac, a bar in Gloucester Heights. The fight occurred about 2:00 a. m. on February 11, 1978 and resulted in at least three stabbings. One of the victims, Michael Franchi, died later that day.

State police took McCloskey to the Gloucester City police station about 2:30 a. m. on February 11, 1978, where the first of four police interrogations took place. Gloucester City police sergeant Robert Fair gave McCloskey the warnings required under *Miranda v. Arizona, supra,* and began to question him. According to Sergeant Fair's testimony, the defendant at that time "said he didn't want to say anything. He wanted to remain silent."

About 4:00 a. m. Gloucester police interrogated McCloskey a second time, without readministering *Miranda* warnings. The defendant gave Sergeant Steven Farrell his name and address. In response to further questioning, the defendant stated that he had left T's Zodiac bar with friends and had become involved in a fight. Defendant then refused further comment.

Defendant's third interrogation occurred about 7:50 a. m., four hours later. Sergeant Farrell and a prosecutor's office detective told McCloskey that he would be charged with atrocious assault and battery and that homicide charges might be lodged if the stabbing victim, Michael Franchi, died. The prosecutor's office detective, Joseph Alesandrini, gave McCloskey *Miranda* warnings and asked him what had taken place. When the defendant again mentioned the fight, Alesandrini asked whether he wanted to make a formal statement. According to Alesandrini, the defendant "then said he wants to talk to a lawyer before he says anything else."

Police did not interrogate the defendant a fourth time until fourteen hours later, about 10:15 p. m. on February 11, 1978. By that time Michael Franchi had died, and police had moved McCloskey to the Camden County Jail. Despite McCloskey's

request for counsel fourteen hours earlier, he had not been provided an attorney. Alesandrini again read McCloskey the *Miranda* warnings and had him initial a card to indicate that he understood his rights. He then read the defendant a new complaint charging him with murder, gave the defendant a copy of the complaint and asked him if he had anything to say. As Alesandrini testified at trial:

A. ....

[McCloskey] was standing there saying nothing and appeared that he was confused, so I asked him if he wanted me to ask him some questions.

Q. What, if anything, took place after that?

A. I asked him several questions.

Q. What did you ask him?

A. The first question was, "Do you want me to ask you questions and you answer?"

He replied: "Yes."

"Did you and Franchi have a fight?"

Answer: "Yes."

"Did you have a knife and he a weapon?"

Answer: "Yes."

He then said, "I want to think this thing over and talk to someone before I say anything else."

Before interrogating McCloskey this fourth time, Alesandrini did not ask McCloskey whether he had spoken with an attorney since his request for counsel fourteen hours earlier. Nor did Alesandrini inquire whether in the twenty hours since his arrest McCloskey had been given food, or access to a telephone, or whether any efforts to obtain counsel for McCloskey had been made.

At a pre-trial proceeding in the Superior Court, the defendant moved unsuccessfully to suppress the incriminating statement that he had made at the Camden County jail and other statements made while in custody. The trial judge noted that police apparently had not given McCloskey *Miranda* warnings at the second interrogation when he first admitted to having been "involved" in a fight. But the judge stated, "I do not find that the colloquy between Sergeant Farrell and this defendant some time around 4:00 that morning was an interrogation." The trial

judge also found that although McCloskey had requested counsel at the third interrogation, the request did not "disable him from ... deliberately waiving counsel" fourteen hours later.

In upholding the police actions against constitutional challenge, the trial judge noted further that each time police interrogated McCloskey they had a purpose besides eliciting incriminating statements. Police solicited McCloskey's name and address at the 4:00 a. m. interrogation, read him the assault and battery charges at the 8:00 a. m. interrogation, and told him of the new murder charges at the 10:15 p. m. interrogation.

[E]ach time there was a contact between the defendant and a police officer who interrogated him, ... there was a purpose for that contact in addition to the purpose of discussing the matter with the defendant so this is not a situation where this defendant was held in custody ... for the purpose or for the sole purpose of trying to break down his will, to overbear him or to place him in a position where he would discuss the case.

The incriminating statement about the knife fight made by McCloskey at the fourth interrogation, fourteen hours after he had requested counsel, was used against him at trial. On July 14, 1978 the defendant was convicted of second degree murder and the other above-mentioned charges.

On May 19, 1981 the Appellate Division affirmed the conviction. The preceding day, the United States Supreme Court had announced its decision in *Edwards v. Arizona*, 451 *U.S.* 477, 101 *S.Ct.* 1880, 68 *L.Ed.*2d 378 (1981), limiting interrogation of criminal suspects in police custody after a request for counsel. Consequently, we remanded the case for reconsideration in light of that decision. 88 *N.J.* 463 (1981).

On remand, the Appellate Division again affirmed the conviction. The court construed defendant's request for counsel at the third interrogation as a request only for the limited purpose of making a formal statement and not for general protection against self-incrimination. The Appellate Division further concluded that even if the defendant's statement had been inadmissible, the conviction should have been confirmed in light of the state's strong case against him. For these reasons, the Appellate Division concluded that affirmance of the conviction would

not be inconsistent with *Edwards*. As a fallback position, the Court held that *Edwards* should be applied prospectively only.

Defendant again petitioned this Court for certification. The petition was granted limited to the issue of whether defendant's Fifth and Fourteenth Amendment rights were violated, and if so, whether his conviction should be reversed. 88 *N.J.* 501 (1981).

## II

The constitutional command that no person "shall be compelled in any criminal case to be a witness against himself," *U.S.Const.*, Amend. V, is "the essential mainstay of our adversary system." *Miranda v. Arizona*, 384 *U.S.* at 460, 86 *S.Ct.* at 1620, 16 *L.Ed.*2d at 715 (1966). Courts have mandated specific procedures to ensure that criminal defendants are not denied this constitutional right.

In *Escobedo v. Illinois*, 378 *U.S.* 478, 84 *S.Ct.* 1758, 12 *L.Ed.*2d 977 (1964), the United States Supreme Court acknowledged that the privilege against self-incrimination offered no protection to those who did not know their rights, and that this lack of knowledge undermined the legitimacy of our accusatory system of justice.

> [N]o system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights. No system worth preserving should have to *fear* that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, these rights. If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system. [378 *U.S.* at 490, 84 *S.Ct.* at 1764, 12 *L.Ed.*2d at 985–86 (footnotes omitted)]

The Supreme Court recognized in *Escobedo* that the potential for coercion is inherent in police questioning. As a consequence, in *Miranda v. Arizona* the Court prescribed a detailed procedure that police must follow during the custodial interrogation of a criminal suspect.

In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. . . .

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent. [384 *U.S.* at 473–74, 86 *S.Ct.* at 1627, 16 *L.Ed.2d* at 723 (footnote omitted)]

■ The right to remain silent during custodial interrogation and the right to have counsel present are distinct constitutional protections. Both are necessary "to guarantee full effectuation of the privilege against self-incrimination," *Johnson v. New Jersey,* 384 *U.S.* 719, 729, 86 *S.Ct.* 1772, 1778, 16 *L.Ed.2d* 882, 890 (1966). Because courts assume that defendants seek the advantage of such basic protections, they "indulge every reasonable presumption against waiver of [these] fundamental constitutional rights." *Johnson v. Zerbst,* 304 *U.S.* 458, 464, 58 *S.Ct.* 1019, 1023, 82 *L.Ed.2d* 1461, 1466 (1938).

■ It is beyond question that after *Edwards v. Arizona, supra,* police could not question defendant in the manner that led to self-incrimination in this case. *Edwards* established a *per se* rule that prohibits police from initiating any interrogation of a defendant who has requested counsel:

[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that *an accused,* such as Edwards, *having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police.* [451 *U.S.* at 484–85, 101 *S.Ct.* at 1884–85, 68 *L.Ed.2d* at 386 (footnote omitted; emphasis added)]

Under *Edwards*, once McCloskey requested counsel during his third interrogation by police,[1] about 8:00 a. m. on February 11, 1978, police could not later return to his cell and ask him whether he was now ready to answer questions.

Recognizing that the defendant's trial occurred before the *Edwards* decision, the State argues that the *per se* rule in *Edwards* should not be applied retroactively to this case. We agree that if *Edwards* is solely a prophylactic rule, it should not be retrospectively applied, just as the warnings announced in *Miranda* were held not applicable to cases in which trial had begun before the decision was announced. *Johnson v. New Jersey, supra.* However, we find that the police in this case violated defendant's constitutional right to counsel as it existed *at the time of his questioning.*

The Supreme Court held in *Miranda* that when a defendant facing police interrogation has requested a lawyer and

the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. [384 *U.S.* at 475, 86 *S.Ct.* at 1628, 16 *L.Ed.2d* at 724]

---

[1] The State cannot seriously dispute that the defendant requested counsel during his third interrogation. According to the trial testimony of the detective who was questioning him at that time, McCloskey "said he wants to talk to a lawyer before he says anything else."

Because the right to counsel is fundamental, courts interpret equivocal requests for counsel in the light most favorable to the defendant. *See e.g. Maglio v. Jago,* 580 *F.2d* 202, 203 (6th Cir. 1978) ("Maybe I should have an attorney" considered a request for a lawyer); *United States v. Clark,* 499 *F.* 2d 802, 805 (4th Cir. 1974) ("I had better talk to a lawyer" is a request for counsel); *State v. Fussell,* 174 *N.J.Super.* 14, 19 (App.Div.1980) ("I would like to wait for legal counsel after taking [sic]. I would like him to read the statement before I answer" is a request for counsel).

We specifically disapprove the finding of the Appellate Division in this case that McCloskey requested counsel for the limited purpose of making a formal statement, and "not as a condition of talking to the police." There is no precedent for interpreting a request for counsel in such a limited manner.

The State has presented no convincing evidence that before incriminating himself the defendant relinquished his previously asserted right to counsel. In fact, Detective Alesandrini, who elicited the incriminating statement, was the same officer from whom McCloskey had requested counsel fourteen hours earlier. Before interrogating McCloskey, Alesandrini did not ask whether he had spoken with counsel during those fourteen hours, or whether he had been given food or access to a telephone. Moreover, Alesandrini testified that McCloskey appeared "confused" when he made the incriminatory statement.

In spite of all this, the State contends that before *Edwards v. Arizona* it could meet its admittedly heavy burden of proving waiver simply by implication from the fact that the defendant incriminated himself after being given *Miranda* warnings.[2]  *Cf. North Carolina v. Butler*, 441 *U.S.* 369, 99 *S.Ct.* 1755, 60 *L.Ed.2d* 286 (1979) (explicit waiver of right to counsel is not necessary where the defendant was given *Miranda* warnings and had not previously invoked the right to counsel.)  But the Supreme Court clearly stated in *Michigan v. Mosley*, 423 *U.S.* 96, 96 *S.Ct.* 321, 46 *L.Ed.2d* 313 (1975), that a defendant's invocation of the right to counsel gives him additional protection against self-incrimination.  Thus, while upholding the subsequent questioning of a defendant who earlier had invoked his right to remain silent, the Court in *Mosley* stated:

> *Miranda* ... distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and directed that "the interrogation must cease until an attorney is present" ... "[i]f the individual states that he wants an attorney." [423 *U.S.* at 104, *n.*10, 96 *S.Ct.* at 326, *n.*10, 46 *L.Ed.2d* at 321]

Because invoking the right to counsel triggers additional safeguards, the State could not obtain a waiver of the right to counsel simply by administering new *Miranda* warnings.  If new *Miranda* warnings were sufficient to eradicate a request for

---

[2]Aside from the fact that defendant made incriminating statements, there is absolutely no evidence that he intended to waive his previously asserted right to counsel.

counsel, then requesting counsel would give the defendant no greater protection than a defendant receives by invoking only the right to remain silent. Requesting counsel would be meaningless in those cases in which counsel was not subsequently provided before incriminating statements were made. *Mosley* precludes this result.

The *Edwards* decision did not redefine or expand the right to counsel. The Supreme Court merely adopted a prophylactic rule to protect a constitutional right that had already been clearly delineated:

> *Miranda* itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, "the interrogation must cease until an attorney is present." 384 *U.S.* at 474, 16 *L.Ed.2d* 694, 86 S.Ct. 1602, 10 *Ohio Misc.* 9, 36 *Ohio Ops.2d* 237, 10 *A.L.R.3d* 974. Our later cases have not abandoned that view.... [J]ust last Term, in a case where a suspect in custody had invoked his *Miranda* right to counsel, the Court again referred to the "undisputed right" under *Miranda* to remain silent and to be free of interrogation "until he had consulted with a lawyer." *Rhode Island v. Innis*, 446 *U.S.* 291, 298, 64 *L.Ed.2d* 297, 100 *S.Ct.* 1682 (1980). We reconfirm these views and to lend them substance, emphasize that *it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel.* [451 *U.S.* at 485, 101 *S.Ct.* at 1885, 68 *L.Ed.2d* at 386–87 (emphasis added) ]

*Edwards* bars the reinterrogation of all criminal suspects who have invoked the right to counsel unless they initiate further conversation. We hold that this rule applies to all trials which began after the decision was announced. *See Johnson v. New Jersey, supra.* In pending cases that were tried before *Edwards* was announced, such as this case, the *per se* rule requiring a suspect to initiate further conversation does not apply. Nonetheless, the State must meet its heavy burden of proving that the defendant relinquished the right to counsel. *See Miranda,* 384 *U.S.* at 475, 86 *S.Ct.* at 1628, 16 *L.Ed.2d* at 724. Waiver will not be implied from the fact that the defendant incriminated himself after new *Miranda* warnings were given. And a waiver will be held ineffective where, as here, the circumstances cast

doubt on the knowing and intelligent quality of the alleged waiver.

*State v. McKnight*, 52 *N.J.* 35 (1968), comports with our holding today and that of the United States Supreme Court in *Edwards v. Arizona.* Although he had previously requested counsel, the defendant in *McKnight* initiated further conversation with police by asking a jail guard to deliver a note to the prosecutor requesting the opportunity to speak with him. *McKnight* is therefore distinguishable from this case.

The evidence in this case reveals that McCloskey clearly requested counsel during his third interrogation. The State has fallen far short of establishing that the defendant voluntarily relinquished that right. Because a valid waiver of both the right to remain silent and the right to counsel are "prerequisites to the admissibility of any statement made by a defendant," *Miranda*, 384 *U.S.* at 476, 86 *S.Ct.* at 1629, 16 *L.Ed.2d* at 725, the use at trial of McCloskey's statements from the fourth interrogation was constitutional error.

### III

We must now determine whether the use at McCloskey's trial of statements obtained in violation of his privilege against self-incrimination requires a new trial. To answer this question, we must determine whether the error was harmless. The United States Supreme Court has held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 *U.S.* 18, 24, 87 *S.Ct.* 824, 828, 17 *L.Ed.2d* 705, 710–11, *reh. den.*, 386 *U.S.* 987, 87 *S.Ct.* 1283, 18 *L.Ed.2d* 241 (1967). *See also State v. Macon*, 57 *N.J.* 325, 338 (1971) (the test is "whether in all the circumstances there was a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits"). Under the circumstances of this case, we hold that the State must give the

defendant a new trial without using the incriminating statements made during custodial interrogation.[3]

This Court has stated that "the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict." *State v. Macon,* 57 *N.J.* at 335. We have also said that "upon that question the reviewing judge [is] inevitably remitted to his own conscientious judgment." *Id.* at 338. However, certain constitutional errors· so impugn the integrity of our system of justice that any doubts about their prejudice to the defendant must be resolved against the State, which seeks the benefits of its constitutional wrongdoing.

The United States Supreme Court has delineated a few "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California,* 386 *U.S.* at 23, 87 *S.Ct.* at 827, 17 *L.Ed.*2d at 710. *See e.g. Payne v. Arkansas,* 356 *U.S.* 560, 78 *S.Ct.* 844, 2 *L.Ed.*2d 975 (1958) (coerced confession); *Gideon v. Wainwright,* 372 *U.S.* 335, 83 *S.Ct.* 792, 9 *L.Ed.*2d 799 (1963) (right to counsel); *Tumey v. Ohio,* 273 *U.S.* 510, 47 *S.Ct.* 437, 71 *L.Ed.* 749 (1927) (impartial judge). This Court recently has sought to prevent overuse of the "harmless error" doctrine. In *State v. Czachor,* 82 *N.J.* 392 (1980), the Court explained that "errors which impact substantially and directly on fundamental procedural safeguards . . . are not amenable to harmless error rehabilitation." *Id.* at 404. As the Court stated in *State v. Simon,* 79 *N.J.* 191 (1979):

> Errors impacting directly upon . . . sensitive areas of a criminal trial are poor candidates for rehabilitation under the harmless error philosophy. . . . For this reason, the rule of harmless error should be summoned only with great caution in dealing with the breach of fundamental procedural safeguards "designed to assure a fair trial." [*Id.* at 206 (citations omitted)]

---

[3]Because the State must readminister *Miranda* warnings whenever it subsequently questions a suspect who has invoked the right to remain silent, *see Michigan v. Mosley, supra,* the prosecution cannot use any statements made during McCloskey's second interrogation, before which new *Miranda* warnings were not given. *See supra* at 21.

Where the State has violated the defendant's privilege against self-incrimination, courts have two important reasons for applying harmless error doctrine sparingly. First, the importance of the privilege to our accusatory system of justice requires us to guard carefully against its infringement.[4] The privilege "is not only a protection against conviction and prosecution but a safeguard of conscience and human dignity and freedom of expression as well." *Ullmann v. United States*, 350 *U.S.* 422, 442, 445, 76 *S.Ct.* 497, 509, 510, 100 *L.Ed.* 511, 528 (1956) (Douglas, J., joined by Black, J., concurring).

Second, the improper use of incriminating statements made by a criminal defendant has great potential for prejudice. We can assume that inculpatory remarks by a defendant have a tendency to resolve jurors' doubts about a defendant's guilt to his detriment. Such prejudice seems especially likely where, as here, the State relies almost entirely upon the testimony of eyewitnesses whose credibility will be enhanced by any corroboration.

Although several witnesses testified at trial to the defendant's possession of a knife at the scene of the fatal stabbing, and to incriminating statements made at that time by the defendant, no one testified to having witnessed the fatal stabbing. Further, the hearsay testimony as to the victim's identification of the "blond kid" who attacked him may have referred not to McCloskey, but to one of the defendant's companions at the scene, who was also blond.

---

[4]Protection against self-incrimination under common law dates back at least to the mid-17th century abandonment in England of the oppressive Star Chamber Oath, which bound witnesses to answer all questions on any subject without knowledge as to whether they were accused of any crime. *See* Library of Congress, *Constitution of the United States of America, Analysis and Interpretation,* 1106 (1972); *Miranda v. Arizona,* 384 *U.S.* at 458–59, 86 *S.Ct.* at 1619, 16 *L.Ed.*2d at 714. For thirteenth century commentary that "the principle that no man is to be declared guilty on his own admission is a divine decree," *see* Maimonides, *Mishneh Torah* (Code of Jewish Law), Book of Judges, c. 18, ¶ 6, III Yale *Judaica Series* 52–53, cited in *Miranda v. Arizona,* 384 *U.S.* at 459 *n.27, 86 S.Ct.* at 1619 *n.27.*

Even absent the unlawfully obtained statements made by the defendant while in custody, the State has sufficient evidence so that a reasonable jury might convict him. However, on the facts of this case the Court is not "able to declare a belief that [the error] was harmless beyond a reasonable doubt." *Chapman,* 386 *U.S.* at 24, 87 *S.Ct.* at 828, 17 *L.Ed.*2d at 711. We therefore reverse defendant McCloskey's conviction on all charges and remand for a new trial.

*For reversal and remandment*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For affirmance*—None.