577 A.2d 821

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. QUINCY
SPRUELL, A/K/A QUINCY SPRUILL,
DEFENDANT–RESPONDENT.

Argued January 17, 1990—Decided July 30, 1990.

*John S. Redden*, Deputy First Assistant Prosecutor, argued the cause for appellant (*Herbert H. Tate, Jr.*, Essex County Prosecutor, attorney; *John S. Redden*, of counsel and on the briefs).

*Camille M. Kenny* argued the cause for respondent (*Clapp & Eisenberg*, attorneys; *Arnold I. Budin*, former Public Defender Designated Counsel, on the brief).

The opinion of the Court was delivered by

**HANDLER, J.**

This appeal presents a variation of the issue considered and resolved in *State v. A. Gross*, 121 *N.J.* 1, 577 *A.*2d 806 (1990), and *State v. F. Gross*, 121 *N.J.* 18, 577 *A.*2d 814 (1990), also decided today. In this case, defendant, Quincy Spruell, was tried and convicted for murder and related offenses. Derrick Notis and Onnie Simmons were witnesses who had given prior statements that were inconsistent with their trial testimony. Those prior inconsistent statements were admitted for purposes of both impeaching these witnesses and as substantive evidence. On appeal, the Appellate Division, consistent with its reported opinion in the case of *State v. A. Gross*, 216 *N.J.Super.* 98, 523 *A.*2d 215 (1987), ruled that it was error to admit those statements in evidence without a preliminary hearing to establish their reliability. It remanded the case for such a hearing to be conducted in accordance with its opinion in *State v. A. Gross*. The court ruled further that if the statements be found to have been reliable and admissible, the convictions were to stand; if not, the convictions were to be vacated and a new trial granted. A member of the court dissented, however, on the ground that the admission of these statements without such a hearing was harmless error because the failure to hold such a hearing engendered "no likelihood of a miscarriage of justice."

Based on the dissent, the State filed a notice of appeal as of right. *R.* 2:2–1(a)(2). The defendant filed an appeal as of right that was dismissed by this Court on the State's motion; we denied defendant's separate petition for certification. 114 *N.J.* 493, 555 *A.*2d 615 (1989). The grounds of the dissent thus constitute the sole issue on this appeal.

I.

The issue on appeal is whether the asserted error in failing to have conducted a hearing under *Evidence Rule* 8 to determine the reliability of prior inconsistent statements of declarants as a

condition to their admission in evidence for substantive purposes is harmless. The issue is fact-sensitive, its resolution calling for a thorough review of the record.

The record discloses that on February 22, 1985, Leonard Thompson was found dead in the kitchen of his third-floor apartment at 299 South Harrison Avenue, East Orange, a ten- to twelve-story apartment building with an awning over its front door and a parking lot across the street. A suspected narcotics dealer, Thompson had been shot several times at close range in the head, neck, chest, and arms. Death occurred on either February 20 or 21, 1985. A search of Thompson's apartment revealed that there had been no forced entry. The body was found lying in the kitchen area with a pillow over its head and "a considerable amount of blood" on the floor and throughout the apartment. Two .25–caliber automatic shell casings were found in the apartment.

The East Orange Police Department developed a lead in the investigation when it received information from Aaron Diggs and his mother, Mrs. Alberta Diggs. On April 23, 1985, Alberta Diggs made a sworn statement in which she said that on a Saturday morning in February 1985 she had overheard defendant, who at the time had been standing on her front steps with Shawn Cummings and two others she knew by sight, say, "I know that motherfucker is dead the way I shot him in his ass." The information received from Aaron and Alberta Diggs led the police to Derrick Notis and Onnie Simmons.

Notis gave a statement to Detective McGarry on April 27, 1985. Notis related that on a Thursday evening in late February 1985, defendant and Cummings had come to Simmons's house, where Notis was staying. He said defendant and Cummings had awakened him and Simmons and had told them they had "pulled a job in East Orange," and that "they ripped a dude off and got about nine thousand dollars." According to the statement, defendant had told Notis "the man took too long so he popped his ass." Using "a .25 caliber," he had "shot the

man." Defendant had "put the gun in front of him and he showed me how it happened. He said the man tried to run but ... he caught his ass. Then he dragged him in the kitchen and Freak [Cummings] found the money and [defendant] said he put two bullets in his head." Defendant had told him that "there was blood all over the apartment." About a month after the incident, Notis's statement said, he had accompanied defendant when defendant sold "the gun he shot the man with" to someone known as Little Red. When asked why the job had been done, Notis said, "[f]rom what I hear the dude who got shot by Tariq [defendant] beat up Fat Betty Barber and she had him set up."

Simmons gave a similar version of the facts in a statement made to Detective McGarry on April 29, 1985. Simmons, a juvenile, was accompanied by his father when he gave his statement. Simmons's statement indicated that one night in late February 1985 defendant and Shawn Cummings had awakened Notis and Simmons at his home, showing money and saying it had come from a robbery in East Orange. Defendant had given Simmons $200 and Notis $20 because "[w]hen anybody scores on a job we share the money." Simmons's statement also said defendant had had "a .25 caliber auto" and that defendant had "said the man tried to run and [defendant] shot him at the door. After that they chased him through the apartment and caught him." Defendant had told Simmons he had shot Thompson "more than twice," and that "the man was holding his head after he shot him." The statement further said that one time while he was in Maryland, defendant had told "a friend of his that he came off with $8000.00 from a job in East Orange and he said he got over ... he didn't get caught by the police."

Based on the statements of Notis and Simmons, Detective McGarry obtained a warrant for the arrest of Quincy Spruell. On May 2, 1985, defendant was arrested in Baltimore, where he was working and living with his father. Detective McGarry and Investigator John Farley of the Essex County Prosecutor's

Office went to Baltimore and questioned defendant that evening. After informing defendant of his *Miranda* rights, Detective McGarry typed a statement that contained defendant's answers to various questions, which defendant read and signed.

Defendant's statement explained that a woman known as "Fat Betty" had given a person he knew as "Quasim" "a key to an apartment in East Orange on South Harrison Street" because "she wanted us to do a robbery [and] give her some of the money that this dude had." About two weeks before the robbery, defendant said, he, Shawn Cummings, and Fat Betty had gone "to South Harrison Street in East Orange and she pointed out a large brick building ... [with] an awning in front over the door and ... cars parked in front of the building." According to defendant's statement, two weeks later, defendant had met Shawn Cummings, Quasim, and "Big Head Salaam" at a bar. He then described in detail the robbery that had occurred in a third floor apartment on South Harrison Street. When asked if anyone in the apartment had been bleeding, defendant said, "Yes the one in the back bedroom, the one Salaam was kicking his ass." Defendant then identified Thompson in a photograph of two men as "the one who was bleeding in the apartment on S. Harrison Street, East Orange the night of the robbery." At Onnie Simmons's house, defendant explained, the proceeds had been divided as follows: $1,100 for defendant and Cummings; $750 each for Quasim and Salaam; $250 for Fat Betty; and $200 for Simmons. Defendant also stated that he had owned a .25–caliber automatic during the time of the South Harrison Street robbery and that he later sold it to "Little Red." He denied, however, that during the robbery he had been in possession of the gun or that he or anyone else had shot anyone. On the way back defendant pointed out as the site of the robbery 490 Tremont Avenue in Orange.

Defendant was indicted in July 1985 for murder, *N.J.S.A.* 2C:11–3a(3); first-degree robbery, *N.J.S.A.* 2C:15–1; unlawful possession of a handgun, *N.J.S.A.* 2C:39–5b; and possession of

a handgun for an unlawful purpose, *N.J.S.A.* 2C:39–4a. At a jury trial, the State called Alberta Diggs, who testified during cross-examination that she recalled having told a defense investigator that she had told the police "anything they wanted to hear" because she had believed her son was in danger from the Mafia and the police had offered to protect him if she cooperated, and because "[t]hey were trying to say Aaron was the third person." She also testified that the police told her before she gave her statement that they had already taken a statement from defendant. On redirect, however, Diggs said her statement (that she had overheard defendant say, "I know that motherfucker is dead the way I shot him in his ass") was true and that she had not been threatened by the police at the time she had given it.

Derrick Notis was also called as a witness. Before he testified, he was questioned by the prosecution about whether he intended to talk about a letter he had written to defendant in July 1985, while defendant was incarcerated, the contents of which recanted his April 27, 1985 statement to the police, and about whether he intended to testify contrary to the latter statement. When it became clear that Notis would recant, defense counsel objected unsuccessfully to the admission into evidence of Notis's original statement on the basis that it was unreliable.

Before the jury, Notis acknowledged that the signature on the April 27, 1985 statement was his own. Nevertheless, he denied any responsibility for the statement's contents, saying he had no recollection of having given any statement. When asked each of the questions and answers contained in the statement and whether he remembered them, defendant repeatedly denied having any recollection. Notis claimed Detective McGarry had, in fact, not asked him anything, but had simply thrown the "already typed" statement "in front of me and said sign this." "I said no and [McGarry] smacked me in my face.... McGarrett [sic] kept smacking me until I signed it." Notis went on to testify that nothing in the statement was

true. He had never seen defendant with a gun nor been told by defendant that defendant had one; he had never been told by defendant that defendant had been involved in any kind of robbery; and he had never been told about any alleged incidents that occurred at 299 South Harrison Street. Notis also testified that he had never seen Spruell with any kind of money, and that what he knew about Leonard Thompson's murder was only what he had read in the newspapers. Notis further acknowledged that he had written the July 1985 letter to defendant, stating that he had been intoxicated when he made his statement, and that the police had forced him to sign it, that he did not realize what he was doing when he gave the statement, and that because he thought the police were going to lock him up, he *said* "anything." He characterized that passage, however, as "a mistake," saying he had been "referring to signing." After Notis had testified, defense counsel moved for a mistrial on the basis that Notis's statement was unreliable, but the motion was denied.

Onnie Simmons also denied at trial having given his statement to Detective McGarry, although he acknowledged having signed its pages. Simmons testified that the police had told him that Derrick Notis had already given them a statement and that they would bring criminal charges against him if he did not give one as well. The police also had told him, he claimed, that they would keep him in custody "until they go to trial." He recalled Detective McGarry asking him questions on April 29, 1985, but had no recollection of specific questions or answers pertaining to defendant's involvement in the alleged incident. He also recalled having told a defense investigator that after "three hours of being scared" during interrogation, he had signed a statement "they made up." He had seen neither the document he had signed nor its contents, but had signed it because he had been "forced" to by Detective McGarry. Nevertheless, Simmons testified, there was no truth in the statement he had given that involved defendant in any "robbery homicide."

Detective McGarry testified that he had never struck, threatened, nor made any promises to Derrick Notis, and that to his recollection Notis had not been intoxicated at the time he had given his statement. McGarry also testified that he had never told Simmons he had a statement from Notis or that they were going to lock him up if he did not cooperate. He denied that Simmons had been at the police station for more than "approximately one hour," and he denied that Simmons had signed a statement made up by the police after he had been scared for three hours. Following this testimony and at the close of the State's case, Notis's and Simmons's statements were admitted into evidence over defense objections.

Defendant testified and presented an alibi defense. He claimed that from 12:00 noon on February 21, 1985, until some time the next afternoon, he had been at his mother's home, with her and his girlfriend, celebrating the eleven-month birthday of his daughter. Defendant's mother and girlfriend testified in support of the alibi. Defendant also testified that in his statement to Detective McGarry, which had been ruled admissible following *Miranda* hearing, he had been referring not to a February 1985 robbery on South Harrison Street in East Orange but to the robbery of Jacob Cox on Tremont Avenue in Orange that had occurred in March 1985. Fat Betty Barber had been Jacob Cox's girlfriend, defendant testified, and because Cox had beat her up one time, Barber had asked Quasim to do the same to Cox. Barber had given Quasim the key to Cox's apartment, and thereafter Quasim, defendant, Shawn Cummings, and Big Head Salaam had gone there. Defendant testified that he had stood near the doorway as the others had entered and set upon the two men and a woman within. According to defendant, Salaam had beat up Cox while Shawn Cummings had gathered stereo equipment and money, $1100 of which had later been given to defendant.

Betty Barber testified in corroboration of defendant's story regarding the Cox robbery. She claimed to have no knowledge of Leonard Thompson or his apartment. Jacob Cox testified

that he lived on the second floor of 490 Tremont Avenue in Orange, an approximately three-story brick building with no awning in front. He also testified that he had lived with Betty Barber and in March 1985 had beaten her up. Some time thereafter, Cox stated, three to four men had entered his apartment with a key and robbed him of $4,000 and stereo equipment while his brother and a female friend had been visiting. Cox identified defendant as being among the group of perpetrators and as having been armed with a .32–caliber firearm during commission of the robbery.

The trial court gave standard instructions to the jury concerning its determination of the credibility of witnesses. It stressed the testimony concerning the prior inconsistent statements and the importance of considering "all of the circumstances" surrounding the statements, "including such factors as where and when the prior statement ... occurred and the reasons if any therefor." After the jury had been charged, defense counsel made three objections, one of which related to the adequacy of the instruction concerning the jury's consideration of the prior inconsistent statements.

Defendant was found guilty on all four counts of the indictment. The court denied his motion for a new trial and, in December 1985, sentenced him to an aggregate term of thirty years with a thirty-year parole disqualifier.

## II.

The State does not dispute the Appellate Division's determination that the trial court should have conducted an *Evidence Rule* 8 hearing to determine the reliability of Notis's and Simmons's statements as a condition to their admissibility under *Evidence Rule* 63(1)(a). It contends, however, consistent with the dissenting opinion below, that the error was harmless.

We have now ruled in *State v. A. Gross*, 121 *N.J.* 1, 577 *A.*2d 806 (1990), and *State v. F. Gross*, 121 *N.J.* 18, 577 *A.*2d 814 (1990), decided today, that a prior inconsistent statement sought to be admitted for substantive purposes under

*Evidence Rule* 63(1)(a) must be the subject of a preliminary hearing under *Evidence Rule* 8 to establish its reliability as a condition to its admissibility. We held in *State v. A. Gross, supra,* 121 *N.J.* 1, 577 *A.*2d 806, the burden of proving the reliability of such a prior inconsistent statement is by a fair preponderance of the evidence. Moreover, the standard for determining reliability is one that invokes all surrounding circumstances. *Id.* at 16–17, 577 *A.*2d 806. We particularly noted that the status of the declarant can be a highly relevant circumstance, especially if the declarant is a criminal suspect and is implicated in the underlying crime for which defendant is being prosecuted and has given the statement while in police custody. *Id.* at 16–17, 577 *A.*2d 806. We reasoned that the out-of-court statements of such persons can be inherently suspect. *Id.* at 16, 577 *A.*2d 806.

The question here is whether the court's failure to have determined reliability as a condition for the admission of the prior inconsistent statements was harmless error obviating a remand for purposes of conducting such a reliability hearing under *Evidence Rule* 8. In that connection the State asserts that because "the witnesses [Notis and Simmons] were present in court and subject to full cross-examination by the defendant, neither the admission of their statements nor the failure of the judge to make a preliminary determination on the 'reliability' question offended the defendants' rights under the Confrontation Clause of the Sixth Amendment," and the error, therefore, "was not of constitutional dimension." Thus, the standard of review is whether the error was of such a nature as to have been clearly capable of producing an unjust result. *R.* 2:10–1.

For our purposes, we need not consider whether there is any practical distinction between the standard of review governing constitutional errors: requiring reversal unless the error was harmless beyond a reasonable doubt, see *Chapman v. California,* 386 *U.S.* 18, 87 *S.Ct.* 824, 17 *L.Ed.*2d 705 (1967); *Fahy v.*

*Connecticut,* 375 *U.S.* 85, 84 *S.Ct.* 229, 11 *L.Ed.*2d 171 (1963); *State v. McCloskey,* 90 *N.J.* 18, 446 *A.*2d 1201 (1982); and the standard set out in *Rule* 2:10–1 for plain-error review generally: clear capacity to bring about an unjust result, see *State v. Winter,* 96 *N.J.* 640, 647–58, 477 *A.*2d 323 (1984); *State v. Macon,* 57 *N.J.* 325, 273 *A.*2d 1 (1971); Pressler, N.J.Court Rules, *Comment R.* 1:7–5 (1990). The ultimate inquiry focuses on the possibility of injustice "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *State v. Melvin,* 65 *N.J.* 1, 18–19, 319 *A.*2d 450 (1974) (quoting *State v. Macon, supra,* 57 *N.J.* at 336, 273 *A.*2d 1).

The dissent below concluded that "[b]eyond any doubt, defendant's confession, together with the testimony of Mrs. Diggs, was sufficient to convict defendant." The State emphasizes that the error was harmless because there was ample evidence of the defendant's guilt in the form of the defendant's own admissions: one overheard by Alberta Diggs, and those made directly to Detective McGarry. The State discounts defendant's reference to the Cox robbery on Tremont Avenue, suggesting that that establishes his participation in two crimes.

We do not underestimate the strength of the State's case against defendant even without the statements by Notis and Simmons. In contradiction of his trial testimony that he had never owned a gun, defendant confessed that he had owned a .25–caliber firearm, the same caliber as that of the shells found in the decedent's apartment. Additionally, his confession that he had, by unforced entry, using a key supplied by Fat Betty, robbed a third floor apartment in a large building with an awning on South Harrison Street, across from a big parking lot, would seem to have linked him strongly to 299 Harrison Street. That confession, together with defendant's photo identification of the decedent, may well have been sufficient to convince a jury of his guilt.

On the other hand, no physical evidence was found linking defendant to the murder scene. Defendant testified at trial that in his statement to the police he had been referring to the Cox robbery, and aspects of his confession support that claim. For example, defendant confessed to a robbery on South Harrison involving the use of a key supplied by Fat Betty. Whoever murdered Leonard Thompson apparently had made an unforced entry, a fact that was also consistent with defendant's confession, yet Fat Betty denied knowing Thompson and testified that she had supplied the key for the Cox robbery. Cox also testified that a key had been used when his apartment had been robbed by defendant. Similarly, defendant confessed to a robbery involving three victims, two men and a woman, which fit the situation Cox described. Further, Detective McGarry testified that there had been no evidence that three people had been in Thompson's apartment. In addition, on the journey back from Baltimore, defendant had shown the police 490 Tremont Avenue in Orange, Cox's address, as the location of the robbery. Finally, defendant's alibi was consistent and unimpeached, if supported only by obviously biased witnesses. With respect to Alberta Diggs' testimony, the remark by defendant that she claimed to have overheard made no specific reference to the crime on South Harrison Street. Moreover, on cross-examination she said that the police had told her they already had taken a statement from defendant and that she had spoken to them out of concern for her son's well-being, calling into question the credibility of her own testimony.

There remains the distinct possibility that Notis' and Simmons' recantations were given some weight by the jury. As the State itself points out, the Notis and Simmons "detailed statements corroborated each other and were further corroborated by Mrs. Diggs' testimony, the defendant's confession, and the condition of the victim's body and the crime scene." To that may be added that Notis' and Simmons' statements supplemented the other two statements in significant, highly inculpatory ways. Although defendant had confessed that one of

the three victims in the robbery he described had been bleeding (because Salaam had been beating him in a back room), it was Notis and Simmons who recounted vividly defendant's description to them of how he had chased a robbery victim through the victim's apartment, had dragged him into the kitchen, and had "popped his ass" by putting "two bullets in his head" with a .25–caliber firearm.

Thus, although the State's case was not lacking, the Notis and Simmons statements provided a level of detail and plausibility investing them with the potency to lead the jury to determinations it might not have otherwise reached beyond a reasonable doubt. If the statement were used without a proper foundation, that result is unjust. Therefore, to the extent the statements should not have been admitted, we are unable to conclude that the error was harmless.

The Appellate Division also concluded that "[a]lthough not raised by defendant as an appellate issue ... the admissibility of the prior inconsistent statements of Notis and Simmons is dependent upon a determination that the statements were made in circumstances establishing their reliability. *Evid.R.* 63(1)." It determined that "[t]he record here ... does not provide enough information for us to decide this issue without ... a hearing, nor can we say that the jury instructions were sufficient to correct any error in the failure to have held a reliability hearing." The dissent disagreed that defendant "is entitled to a reliability hearing as to the prior inconsistent statements of Notis and Simmons."

We agree with the Appellate Division's assessment that "[t]he record ... does not provide enough information" to decide whether the circumstances surrounding Notis's and Simmons's statements established their reliability. Notis and Simmons recanted unequivocally at trial, each alleging that forms of coercion had been used to get them to sign their statements. Although it may seem implausible, as the State argues, that the police had simply placed completed statements before them for

signing, a failure to accept part of Notis' and Simmons' claims would not establish that others of their claims—for example, that coercive interrogation methods had been used—were untrue and that their statements had been made in circumstances establishing reliability. Moreover, the trial court made no findings or conclusions on that question.

We do not subscribe to the position of the dissent below that the error was corrected and the need for a reliability hearing was obviated because "the jury was made sufficiently aware of the need to determine the reliability of the conflicting statements of the witnesses." A method for determining specifically whether Notis' and Simmons' statements had been given under circumstances establishing their "reliability" was never provided in the jury instructions. Only a general reference was made to the need for the jurors to determine the "witness' credibility" and the general probative worth of the evidence by considering "all the circumstances under which the claimed prior inconsistent statement ... occurred, the extent and importance or lack of importance of the inconsistency on the overall testimony of the witness as bearing on his or her credibility including such factors as where and when the prior statement or omission occurred and the reason if any therefore." That charge was adequate to focus the attention of the jury on the considerations generally relevant to determine the probative worth of the statements. *See State v. A. Gross, supra,* 121 *N.J.* at 16–17, 577 *A.*2d 806; *State v. F. Gross, supra,* 121 *N.J.* at 28–30, 577 *A.*2d 814). Yet, as the Appellate Division in *A. Gross* said, the purpose of the *Evidence Rule* 8 inquiry "is not to determine the credibility of the out-of-court statements" but "whether the prior statement was made or signed under circumstances establishing sufficient reliability that the factfinder may fairly consider it as substantive evidence." *State v. A. Gross, supra,* 216 *N.J.Super.* at 110, 523 *A.*2d 215. We made it clear in *A. Gross* that the question of the statements' reliability was one to be determined by the court

under *Evidence Rule* 8 as required by *Evidence Rule* 63(1)(a). 121 *N.J.* at 16–17, 577 *A.*2d 806.

Accordingly, the Appellate Division properly ruled that the matter should be remanded for a reliability hearing under *Evidence Rule* 8, which should be held jointly with the trial court that presided over the separate trial of the co-defendant, Shawn Cummings, a procedure similar to that followed in the companion case *State v. F. Gross, supra.* The Appellate Division, it must be emphasized, was unanimous in the conclusion that if the statements are determined to have been given under circumstances establishing their reliability, they were properly admitted and considered by the jury and the jury's determination of guilt based on all the evidence does not otherwise entail any likelihood of a miscarriage of justice. On that basis that convictions should be sustained if the statements were otherwise properly admitted. We agree with that disposition.

## III.

We affirm the Appellate Division's judgment. The case is remanded for a supplemental hearing under *Evidence Rule* 8 to determine whether the challenged statements were given in circumstances establishing their reliability, as required by *Evidence Rule* 63(1)(a). The convictions shall abide that determination.

*For affirmance and remandment* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal* —None.