**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4037-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TIMOTHY M. LEWIS, a/k/a
DERIAN J. PICKERING,
and TIMMY LEWIS,

    Defendant-Appellant.

_____

Submitted September 16, 2021 – Decided October 20, 2021

Before Judges Fuentes and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 14-08-0975 and 14-08-0976.

Joseph E. Krakora, Public Defender, attorney for appellant (David J. Reich, Designated Counsel, on the brief).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (Patrick F. Galdieri, II, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After the trial court denied defendant's motions to suppress his statement to police detectives and physical evidence police had obtained after stopping a taxicab in which he was a passenger, defendant Timothy M. Lewis pleaded guilty to one count of first-degree robbery, N.J.S.A. 2C:15-1, and one count of second-degree being a certain person not permitted to possess weapons, N.J.S.A. 2C:39-7(b). The trial court sentenced defendant to a ten-year term of imprisonment with a period of parole ineligibility on the robbery charge and a five-year term of imprisonment on the certain-person charge, with the sentences to run concurrently. Because the trial court did not err in denying the suppression motions, we affirm.

I.

We glean the following facts from the record of the suppression hearings. At 9:40 p.m. on January 10, 2014, North Brunswick Police Officer Keri Shutz responded to a police dispatch about a gas-station robbery on Georges Road. After interviewing the gas-station attendant, Shutz relayed over police radio the attendant's description of the suspects: two black men, both wearing black clothing with their faces partially covered and moving towards First Avenue, one armed with a shotgun. Shutz also reviewed a surveillance video, which

2

showed two black males entering the gas station. The unarmed suspect was wearing black sweatpants with the white lining of his pockets visible, gray sneakers, and a black jacket, under which he wore a black hooded sweatshirt. Shutz described the suspects over the police radio.

## A.

When the initial dispatch about the gas-station robbery was made, another North Brunswick Police Officer, Ernest Hanrahan, drove to the vicinity of the gas station, looking for the suspects. After he had parked his car near the intersection of Georges Road and Second Avenue, Hanrahan noticed a taxicab turn and make a U-turn on Second Avenue, "looking for something." He drove towards the taxicab and held his hand out of his window to flag the taxicab down to find out "who was in the area to pick up." The driver told him he was picking up a customer on Second Avenue for a trip to New Brunswick. He advised the driver to be careful because a robbery had occurred in the area and passed on to him the description of the suspects he had heard over the police radio. Hanrahan asked the driver, if he picked up someone matching the descriptions, to turn his hazard lights on and off. He told the driver he would then stop the taxicab to investigate.

3

The taxicab driver testified he remembered Hanrahan telling him to be careful because of the robbery. He both denied and said he did not remember that Hanrahan had described the suspects or had given him instructions about his hazard lights. He did not remember "actively assisting" in the police investigation.

After Hanrahan saw the driver flash his lights and drive away with the lights off, Hanrahan caught up with the taxicab and, with his emergency lights on, stopped it. He exited his vehicle, approached the driver's side of the taxicab, and saw sitting in the back seat a black male, who appeared to be wearing some clothing matching the description of clothing worn by one of the suspects. The passenger was later identified as defendant. Hanrahan told defendant why he had stopped the cab and questioned him about where he was going and where he was coming from. Hanrahan asked Shutz to come to his location so she could observe defendant and determine if she could identify him as one of the suspects. Shutz went to Hanrahan's location and saw in the backseat a black male wearing black sweatpants with white pocket lining, matching what she had seen the unarmed suspect wearing in the surveillance video. She also noticed a backpack next to defendant.

4

Another police officer, John Strzykalski, arrived on the scene, confirmed with defendant he owned the backpack, and asked him if he would "mind" opening it. Defendant opened his backpack and took out a black scarf, a black hooded sweatshirt, a black hooded jacket, and gray sneakers. Shutz recognized those items from the surveillance video as having been worn by the unarmed suspect. After a warrant search showed defendant had several outstanding warrants, Strzykalski placed defendant in handcuffs and arrested him. Hanrahan conducted a pat-down search of defendant and found a large amount of cash in small bills in defendant's pocket.

After the officers transported defendant to police headquarters, his backpack was searched. It contained, among the items, shotgun shells, duct tape, masking tape, a hammer, a flashlight, and rubber gloves.

B.

Detectives Seeta Jones and Michael Braun interrogated defendant on video hours after his arrest, just before 2:00 a.m. on January 11, 2014. Before beginning the interrogation, Jones read defendant his Miranda rights, Miranda v. Arizona, 384 U.S. 436 (1966); defendant acknowledged understanding his rights and signed the Miranda waiver form. In this first statement, defendant denied knowing anything about the gas-station robbery. He told the detectives

he had been at his girlfriend's New Brunswick house earlier in the evening, had left to take a shower at a friend's house in North Brunswick, and then had taken a cab to return to his girlfriend's house. Defendant claimed someone – he did not know whom – had packed the backpack while he showered at his friend's house and he was unaware of its contents. The first statement concluded sometime after defendant indicated he wanted to speak with his lawyer.

Later that day, the police arrested a second suspect, Darien Pickering, and placed him in a holding cell visible to defendant from his cell. Defendant heard Pickering talking to "the officers." As Jones was walking in the cell area intending to question Pickering, defendant said to Jones, "I need to speak with you." Jones took defendant to an interview room.

Defendant testified he had called Jones over and asked her about getting something to eat or drink or to make a telephone call to his family. According to defendant, after he asked Jones for something to eat or drink or for a telephone call and before he gave his second statement, Detective Michael Sauvigne told him "[y]our man, D.P., he's like – he just told me everything that happened" and told defendant Pickering had "sold" him out. Defendant asserted Jones then showed him the surveillance video. The trial court found incredible defendant's

6

testimony about the discussions he purportedly had with Jones and Sauvigne before his second statement.

Defendant's second videorecorded interrogation began at 3:20 p.m., more than twelve hours after the first interrogation had ended. At the beginning of the interrogation, Sauvigne gave defendant a bottle of water and introduced himself.

Defendant did not correct Sauvigne or in any way indicate they had met previously. In response to questions from Jones, defendant acknowledged he was giving a statement "of [his] own freewill and accord" and "[w]ithout force, fear, threat, duress or promise of reward, immunity and leniency." Jones asked Sauvigne if he wanted to read defendant his rights. Sauvigne stated "[y]ep, you already spoke to us right, so you can – or spoke to Detective Jones." Sauvigne then read defendant his <u>Miranda</u> rights. Defendant verbally confirmed he understood those rights, initialed next to each on the <u>Miranda</u> waiver form, and signed the waiver. In the colloquy that followed, Jones confirmed defendant wanted to provide her with new information:

> [DETECTIVE JONES:] Now, I sat and spoke with you this morning regarding this – this case and this is going to be for the robbery of Citgo gas station, do you remember that conversation this morning?
>
> [DEFENDANT:] Yeah.

A-4037-18

[DETECTIVE JONES:]  Okay, um I'm coming to you again because you wanna tell me some new information, correct?

[DEFENDANT:]  Yeah (inaudible).

[DETECTIVE JONES:]  Okay so why don't you tell me what you - what you wanna say?

[DEFENDANT:]  I wanna know if ya'll can help me first.  That's what I wanna know.

[DETECTIVE JONES:]  You gotta help yourself.  I cannot promise you - -

[DETECTIVE SAUVIGNE:]  We told you we can't promise you anything.

[DEFENDANT:]  Okay.

[SAUVIGNE:]  That's for a Prosecutor's Office to do (inaudible).

[DETECTIVE JONES:]  You gotta start here.

[DETECTIVE SAUVIGNE:]  (inaudible) case.

[DETECTIVE JONES:]  You have to start here.  I have - I have all the information I need it's not gonna help you to sit here and lie and say you don't know and that's not your clothing and you don't know about a gun . . . it's not gonna help you.  I have everything, I have evidence I have it - I have it all.

[DETECTIVE SAUVIGNE:]  So, this is your opportunity to talk if you wanna talk to us, that's great

8

if you don't then that's fine with us also. So, balls in your court.

[DEFENDANT:] There's nothing to talk about we caught.

Defendant then confessed to his involvement in the gas-station robbery.

C.

After a grand jury indicted defendant and Pickering with several robbery, aggravated-assault, and weapons-related offenses, defendant moved to suppress evidence obtained from the backpack search. The trial court conducted an evidentiary hearing and denied the motion. Finding Hanrahan's testimony about their discussion more credible than the taxicab driver's testimony, the trial court concluded the flashing hazard lights created a reasonable and particularized suspicion of criminal activity that supported Hanrahan's stop of the taxicab. The court also noted defendant had matched the description of the unarmed suspect. The court held "there was no search of the backpack" because defendant voluntarily had exposed its contents.

Defendant next moved to suppress a sawed-off shotgun recovered during a warrantless search of co-defendant Pickering's residence and the two

A-4037-18

statements he had made after his arrest[1] and moved for reconsideration of the denial of his first suppression motion. The court denied the reconsideration and shotgun motions. Defendant subsequently moved for reconsideration of and for an evidentiary hearing regarding the shotgun motion. The trial court granted that motion, conducted an evidentiary hearing, and denied the motion to suppress the shotgun. Defendant does not challenge any of the shotgun-suppression orders in this appeal.

Regarding the motion to suppress his statements, the trial court conducted an evidentiary hearing, during which Jones and defendant testified. The trial court granted the motion as to defendant's first statement and denied it as to his second statement. With respect to the second statement, the trial court found defendant had "reinitiated the conversation" with the detectives, the detectives had properly advised defendant of his Miranda rights, and defendant had voluntarily and knowingly waived his Miranda rights and made the statement confessing to his involvement in the robbery.

Defendant moved again to suppress the backpack's contents. Defendant pleaded guilty before the trial court decided that motion.

_____

[1] Defendant's counsel and defendant pro se filed suppression motions on both subjects.

A-4037-18

In this appeal, defendant argues:

POINT I

THE TRIAL COURT'S DETERMINATION THAT THE POLICE OFFICER HAD A VALID BASIS TO STOP THE TAXICAB IN WHICH LEWIS WAS A PASSENGER WAS BASED ON A FAULTY LEGAL ANALYSIS.

POINT II

THE TRIAL COURT ERRED IN FINDING NO MIRANDA VIOLATION WITH RESPECT TO LEWIS' SECOND STATEMENT AFTER LEWIS HAD MADE CLEAR DURING HIS FIRST STATEMENT THAT HE DID NOT WANT TO BE INTERROGATED WITHOUT COUNSEL PRESENT.

POINT III

THE FRUITS OF THE UNCONSTITUTIONAL STOP MUST BE SUPPRESSED.

POINT IV

THE INVENTORY SEARCH OF LEWIS' BACKPACK WAS UNCONSTITUTIONAL.

II.

Defendant's appeal boils down to arguments about credibility and what inferences the trial court should have drawn from the evidence presented. Defendant's disagreement with the trial court's credibility determinations and

factual inferences is not a basis for reversal when the trial court's findings are supported by credible evidence in the record. Accordingly, we affirm.

Generally, we uphold a trial court's factual findings made in connection with a motion to suppress when "those findings are supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014). We defer to a trial court's factual findings because they are "informed by [the court's] first-hand assessment of the credibility of the witnesses." State v. Lentz, 463 N.J. Super. 54, 67 (App. Div. 2020); see also State v. S.S., 229 N.J. 360, 380 (2017) (noting criminal-part trial judges routinely hear and decide suppression motions and "have ongoing experience and expertise in fulfilling the role of factfinder"). "[A] trial court's factual findings should not be overturned merely because an appellate court disagrees with the inferences drawn and the evidence accepted by the trial court," S.S., 229 N.J. at 374, but only if the findings are "so clearly mistaken that the interests of justice demand intervention and correction," Gamble, 218 N.J. at 425 (quoting State v. Elders, 192 N.J. 224, 244 (2007)). We review a trial court's conclusions of law de novo. S.S., 229 N.J. at 380.

A.

The United States Constitution and New Jersey Constitution forbid law enforcement from conducting unreasonable searches and seizures. State v. Terry, 232 N.J. 218, 231 (2018). Reasonableness is determined "by assessing . . . the degree to which [the search] intrudes on an individual's privacy and . . . the degree to which it is needed for the promotion of legitimate government interests." State v. Davila, 203 N.J. 97, 111 (2010) (quoting United States v. Knights, 534 U.S. 112, 118-19 (2001)); see also State v. Davis, 104 N.J. 490, 504 (1986) (holding a court, in determining the lawfulness of a seizure, must "balanc[e] the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions").

A motor-vehicle stop is a seizure under the Fourth Amendment. State v. Atwood, 232 N.J. 433, 444 (2018). A motor-vehicle stop is justified and lawful, even absent probable cause, "if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur." Davis, 104 N.J. at 505; see also Atwood, 232 N.J. at 444 (law-enforcement official must have a

reasonable and articulable suspicion "a criminal or motor vehicle violation has occurred").

In determining whether a reasonable and articulable suspicion exists, a court must consider all the circumstances in their totality rather than "looking at each fact in isolation." State v. Nelson, 237 N.J. 540, 554-55 (2019). The law enforcement officer's perspective is a factor in assessing whether a reasonable, articulable suspicion is established. State v. Nishina, 175 N.J. 502, 511 (2003). A court also may consider the background and training of the law-enforcement officers, recognizing officers "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Nelson, 237 N.J. at 555 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). However, "raw, inchoate suspicion grounded in speculation cannot be the basis for a valid stop." State v. Scriven, 226 N.J. 20, 34 (2016). In sum, a court considers whether the totality of the circumstances known to the officer, in light of his or her experience and knowledge, "taken together with rational inferences drawn from those facts," justifies the limited restriction on an individual's liberty during an investigatory stop. Davis, 104 N.J. at 504; see also State v. Robinson, 228 N.J. 529, 544 (2017).

Applying that standard, the trial court correctly determined Police Officer Hanrahan had a reasonable and articulable suspicion to stop the taxicab and the stop was lawful.  Like the trial court, we see nothing "nefarious . . . in enlisting the help of the cab driver."  See State v. Hathaway, 222 N.J. 453, 471 (2015) (finding an ordinary citizen providing information to a police officer is presumed not to have suspect motives).  The trial court's factual findings – Hanrahan was in the neighborhood where the robbery took place, he witnessed a taxicab "looking for something," and after he gave the driver instructions to turn his hazard lights off if he picked up someone matching the suspects' descriptions, he saw the cab drive away with the lights off – were supported by Hanrahan's testimony, which the trial court found to be "completely credible and believable."

The court explained why it found the taxicab driver's testimony less credible:  the driver was "nervous and upset," and "didn't want to be in th[e] courtroom"; "his memory was not all that good"; and his testimony was inconsistent in that "first he might have denied [receiving instructions about using his hazard lights], then he didn't remember" anything about using his hazard lights.  The trial court also found Hanrahan had confirmed defendant and his clothing matched the description of the unarmed suspect and his clothing and

found credible Strzykalski's testimony about defendant voluntarily opening his backpack. We see no basis to overturn those credibility or factual findings or the legal conclusions the trial court made based on those findings.

Having found the taxicab stop to be lawful, we need not address defendant's argument that the additional contents of the backpack discovered at police headquarters, evidence from the search of Pickering's residence, and defendant's statements were "fruits" of an unconstitutional stop.

B.

"[T]he right to counsel is fundamental." State v. McCloskey, 90 N.J. 18, 26 n.1 (1982); see also State v. Dorff, ___ N.J. Super. ___, ___ (App. Div. 2021) (slip op. at 15). The failure to honor the invocation of the right to speak to an attorney generally requires the suppression of any resulting admission. Miranda, 384 U.S. at 465. A suspect who invokes his right to counsel during a custodial interrogation is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); see also State v. Wint, 236 N.J. 174, 194 (2018); State v. Alston, 204 N.J. 614, 620 (2011) (noting that after a suspect has requested counsel, "an interrogation may not continue until either

A-4037-18

counsel is made available or the suspect initiates further communication sufficient to waive the right to counsel").

A suspect is considered to have initiated further communication if he or she invites "discussion of the crimes for which he [or she] was being held." State v. Chew, 150 N.J. 30, 64 (1997) (quoting State v. Fuller, 118 N.J. 75, 82 (1990)). The State must establish it was the accused, rather than the police, who initiated any further questioning after the accused has invoked his right to counsel. State v. Wright, 97 N.J. 113, 122-23 (1984). Yet, "[i]f an accused does initiate a conversation after invoking his rights, that conversation may be admissible if the initiation constitutes a knowing, intelligent, and voluntary waiver of the accused's rights." Chew, 150 N.J. at 61 (citing Miranda, 384 U.S. at 444).

The record supports the trial court's determination that defendant unequivocally initiated further communication with detectives before his second statement. The trial court concluded, after defendant had seen his co-defendant talking with police officers – something which, as the trial court found, "may have ignited an idea in the defendant's mind that [he] better speak to the police and give them [his] version before Pickering gives his version" – he told Jones he wanted to speak with her again. The trial court found Jones to be "very credible" and explained why it found defendant's testimony about the purported

pre-interview conversations with the detectives incredible, including: defendant did not correct Sauvigne when Sauvigne said they had not met before, Sauvigne would not have referred to Pickering as "D.P.," defendant confirmed in his testimony he wanted to tell Jones new information, and defendant's demeanor in talking about the crime. Defendant was read his <u>Miranda</u> rights, knowingly waived them verbally without asking for counsel, signed the <u>Miranda</u> waiver form, and provided a videorecorded statement detailing his involvement with the robbery – all of which supports the trial court's conclusion defendant knowingly and voluntarily waived his rights and gave the second statement.

The trial court rejected defendant's other complaints about the second statement, finding incredible defendant's testimony about being deprived of food and sleep and about being under the influence of NyQuil. The trial court found defendant would have been fed pursuant to usual procedures, a significant time period had lapsed between when defendant had taken NyQuil and had given his statement, and in his videotaped statement defendant had not appeared to be distressed, had not complained about being hungry or tired, and had testified he had slept. We see no basis to disturb those findings. Defendant's other arguments about being given water instead of coffee and not being able to call

18

his girlfriend are not legally or factually significant and do not to rise to the level of a constitutional violation.

C.

We find insufficient merit in defendant's Point IV to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION