**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5102-18
                A-2666-20

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DONALD SCURRY,
a/k/a DONALD SCURRY, JR.,
and TANK SCURRY,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

CHARLES B. CLARK,

      Defendant-Appellant.

_____

      Argued December 18, 2023 — Decided December 28, 2023

      Before Judges Mawla, Marczyk, and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 17-12-1084.

Richard Sparaco, Designated Counsel, argued the cause for appellant Donald Scurry (Joseph E. Krakora, Public Defender, attorney; Richard Sparaco, on the brief).

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant Charles B. Clark (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the brief).

Kaili Elizabeth Matthews, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Kaili Elizabeth Matthews, of counsel and on the briefs).

PER CURIAM

These are back-to-back appeals. In A-5102-18, defendant Donald Scurry appeals from his convictions and sentence for: first-degree murder, N.J.S.A. 2C:11-3(a)(2) (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count two); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count three); third-degree tampering with evidence, N.J.S.A. 2C:29-3(b)(1) (count four); and second-degree possession of a weapon by a convicted person, N.J.S.A. 2C:39-7(b)(1) (count eight). In A-2666-20, defendant Charles B. Clark appeals from his convictions and sentence for: second-degree unlawful possession of a weapon,

N.J.S.A. 2C:39-5(b)(1) (count three); third-degree hindering apprehension, N.J.S.A. 2C:29-3(a)(3) (count five); fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1) (count six); and fourth-degree obstruction of the administration of law, N.J.S.A. 2C:29-1(a) (count seven).

Defendants were tried together before a jury, over the course of eleven days. The same judge heard pre-trial motions, presided at trial, and sentenced defendants.

The victim, Celeste Cannon, lived in Millville with her three children. She had a two-year-old son with Scurry, and three- and four-year-old daughters with Titus Ramsey. At the time of her murder, she was sixteen weeks pregnant with a fourth child, fathered by Andrew Thompson.

Scurry visited Cannon's home late in the morning of September 20, 2017, with his paramour Rachel Green, whom he had asked for a ride. Not long after entering the house, he exited with Cannon's children and told Green he found Cannon lying dead on the floor. Green helped the children into the car and called 9-1-1. Meanwhile Scurry tried to flag down a passing police vehicle for help, but the officer was transporting a prisoner and could not stop. Instead, the officer contacted police dispatch, and Officer William Stadnick responded.

3

The officer spoke with Scurry, who explained he had spotted Cannon's car still parked in front of the home while he was driving by that morning and thought it odd, so he decided to stop and check on her. Scurry said the two-year-old opened the door for him, and he found Cannon's body inside the house.

Officer Jason Vinzinski arrived next, and Scurry told him the last time he had spoken to Cannon was at 8:24 p.m. the prior evening, when he sent her a text message about taking their son for a haircut. He tried calling her at 6:52 a.m. the following morning and, when she did not answer, Scurry asked Green to take him to Cannon's house. Scurry then reiterated much of what he told Officer Stadnick, except he stated he did not enter Cannon's home, claiming he "wouldn't go inside someone's house without permission."

Officers transported Scurry to the police station for a video-recorded interview with Detectives Miguel Martinez and Nelson Ferrer. Scurry recounted the events in a similar fashion, and at the end of the interview consented to a search of his phone. The phone contained a video showing him together with Cannon the morning prior to her murder. At trial, the State introduced a still image from the video depicting Scurry lying down with a nine-millimeter handgun sitting just behind his right shoulder. Scurry's phone also yielded several text messages between him and Cannon the day before the murder.

A-5102-18

Police also collected surveillance footage from several nearby residences and businesses, including a Wawa.

The State's evidence showed Cannon sent her final text to Scurry at 8:21 p.m. the night before the murder. Scurry responded at 8:24 p.m. as follows: "IDC, bitch, you lying." Later that night, Scurry asked Clark's girlfriend, Quashay Brown, for a ride to Cannon's house. She and Clark drove him there in Brown's car and returned to Clark's home after dropping him off. Location data from Scurry's phone placed him outside Cannon's residence as of 12:17 a.m.

Scurry texted Cannon "Bitch, wake TF up" at 12:25 a.m. and two minutes later texted "pick up the fucking phone, you dumb lying bitch," and "I'm about to come over so you know what it is." Security camera footage from a neighbor's residence showed an individual, similar in size and build to Scurry wearing a light-colored sweatshirt and jeans, hurrying away from Cannon's residence.

Scurry eventually called Brown and Clark for a ride and asked to be picked up on a side street. They picked him up, and Wawa security camera footage showed they stopped at the Wawa at 3:22 a.m., on their way back to Green's house. Scurry and Clark went into the store together while Brown was outside getting gas. Both men then returned to Brown's car, and Brown went into the store.

A-5102-18

Brown testified that when they arrived at Green's house, Scurry and Clark got out of the car and had a short conversation in the driveway. Scurry then entered Green's home and went to bed. Clark returned to the car and asked Brown to drive him to another nearby Wawa beyond a bridge, which spanned the Maurice River. When they were nearly halfway over the bridge, Clark told Brown he had changed his mind and wanted to turn back. As Brown made a U-turn, she observed Clark reach out of the passenger window and "chuck[]" something with enough force to reach the water.

Police recovered a spent nine-millimeter shell casing melded to a couch's vinyl, next to Cannon's body. A passerby found a gun, a nine millimeter gun, in the Maurice River a few days after the murder. Police also interviewed Thompson and Ramsey. Ramsey arrived at the scene the morning Cannon's body was discovered and was extremely distraught and difficult to calm down.

Following their convictions, the trial judge sentenced Scurry to a fifty-five-year term subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, on count one, and merged counts two and three into count one. Defendant received a five-year concurrent term of incarceration on count four, and a ten-year consecutive term on count eight with a five-year period of parole ineligibility

A-5102-18

under the Graves Act, N.J.S.A. 2C:43-6(c).  Under a separate indictment, Scurry received a concurrent five-year flat term for violating probation.

Clark was sentenced to eight years with four years of parole ineligibility on count three and a concurrent four-year flat term on count five.  Counts six and seven were merged with count five.

Scurry raises the following arguments on appeal:

> POINT I    THE DENIAL OF THE DEFENDANT'S MOTIONS TO SUPPRESS DENIED HIM THE RIGHT TO A FAIR TRIAL.
>
> > (a)    THE    DEFENDANT'S    FORMAL STATEMENTS TO DETECTIVES SHOULD HAVE BEEN SUPPRESSED BECAUSE THE DEFENDANT WAS IN CUSTODY AND WAS NOT ADVISED OF HIS MIRANDA[1] RIGHTS.
> >
> > (b)    THE    DEFENDANT'S    MOTION    TO SUPPRESS THE RESULTS OF THE SEIZURE AND EXAMINATION OF HIS CELL PHONE SHOULD HAVE BEEN SUPPRESSED AS THE FRUIT OF THE POISONOUS TREE.
>
> POINT II DEFENDANT    WAS    DENIED    THE RIGHT TO A FAIR TRIAL WHEN THE STATE WAS PERMITTED TO IMPEACH ITS OWN WITNESS: THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ALLOWING THE STATE TO PLAY THE PRIOR STATEMENT OF WITNESS . . . BROWN TO THE JURY; THE STATE IMPROPERLY IMPEACHED ITS OWN WITNESS WITH HER

---

[1]  Miranda v. Arizona, 384 U.S. 436 (1966).

A-5102-18

PRIOR INCONSISTENT STATEMENT THAT SHE OBSERVED THE CODEFENDANT THROW AN OBJECT FROM THE BRIDGE OVER THE MAURICE RIVER WHERE THE PURPORTED MURDER WEAPON WAS LATER RECOVERED.

POINT III  THE DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL WHEN THE COURT LIMITED HIS ABILITY TO PRESENT EVIDENCE OF THIRD-PARTY GUILT.

POINT IV  THE DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE COURT'S FAILURE TO PROPERLY WARN THE JURY TO DISREGARD DEFENDANT'S ASSERTION OF HIS RIGHT TO REMAIN SILENT IN ITS FINAL JURY INSTRUCTIONS.  (Not Raised Below).

POINT V  THE VIDEO LOCATED ON DEFENDANT'S CELL PHONE WHICH PURPORTEDLY SHOWED A FIREARM AT OR NEAR THE DEFENDANT WAS INADMISSIBLE AS A PRIOR BAD ACT UNDER N.J.R.E. 404(B) AND WAS ERRONEOUSLY ADMITTED AS PROPENSITY EVIDENCE, THEREBY DENYING THE DEFENDANT A FAIR TRIAL.

POINT VI  DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE INADMISSIBLE LAY OPINION TESTIMONY BY THE INVESTIGATING DETECTIVE THAT THE DEFENDANT WAS THE PERSON DEPICTED ON THE WAWA SURVEILLANCE VIDEOS, THEREBY INVADING THE PROVINCE OF THE JURY AS THE FACTFINDER.  (Not Raised Below).

POINT VII  THE DEFENDANT MUST BE RESENTENCED BECAUSE THE COURT DID NOT

8

ADDRESS THE OVERALL FAIRNESS OF THE CONSECUTIVE SENTENCES. (Not Raised Below).

Clark raises the following arguments on his appeal:

POINT I    THE COURT ERRED IN DENYING DEFENDANT'S MOTION TO DISMISS THE UNLAWFUL POSSESSION OF A HANDGUN CHARGE AT THE CLOSE OF THE STATE'S CASE.

POINT II    THE COURT ERRED IN DENYING SEVERANCE OF SCURRY'S BRUTAL MURDER OF A PREGNANT WOMAN FROM DEFENDANT'S MERE DISPOSAL OF THE HANDGUN AFTER THE FACT.

POINT III    THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE THAT SHOULD BE REDUCED.

I.

Scurry argues the court erred in declining to suppress the statements he made to detectives during his interview and the text messages they obtained from his phone. He contends his statements were made in the context of a custodial interrogation and were un-Mirandized. As a result, he also argues the text messages should have been suppressed as fruit of the poisonous tree.

Generally, a custodial interrogation is any "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at

444.  It need not entail a formal arrest, handcuffs, or other physical restraint, or even necessarily occur at a police station.  State v. P.Z., 152 N.J. 86, 103 (1997).  Absent a formal arrest, the "critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors[,]" such that the restraint on the suspect's freedom of movement is "of the degree associated with a formal arrest."  Id. at 102-03 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).

A trial court's findings of fact on this issue are entitled to deference on appeal so long as they are supported by sufficient credible evidence in the record.  State v. Elders, 192 N.J. 224, 242-44 (2007).  However, we review a court's conclusions on matters of law de novo.  State v. Shaw, 213 N.J. 398, 411 (2012).

At the suppression motion hearing, Officer Stadnick testified about his conversation with Scurry outside the house after he and emergency medical personnel confirmed Cannon was dead.  Scurry told Officer Stadnick he had tried contacting Cannon several times the night before and again in the morning without success.  That morning, while driving by her house, he noticed her car

still parked in front and thought that odd, so he decided to check on her. He then found Cannon's body after his son let him into the house. As he finished speaking with Officer Stadnick, he agreed to wait at the scene until detectives arrived.

Detective Martinez, who was familiar with Scurry from prior investigations, arrived and briefly spoke with him outside the house before entering to investigate. When he returned, he asked whether Scurry would be willing to give a formal statement regarding his discovery of Cannon's body. Scurry agreed, and Detective Martinez transported him to the police station, where detectives interviewed Scurry for approximately ninety minutes.

Notably, on the recording, just prior to the interview, a voice can be heard off camera, which Detective Martinez identified as belonging to an officer having a phone conversation about an unrelated case nearby. In the off-camera conversation, an officer is apparently persuading someone to come to the station to speak with police and advising the person there is no warrant for their arrest. The video recording shows the interview room was still dark and unoccupied while the off-camera conversation was taking place. Then, Detective Ferrer enters the room, turns on the lights, and brings Scurry in to wait for the interview to begin. The off-camera conversation continues, while Scurry is waiting alone

11

in the room, not engaged in a conversation until the video captured the sound of the phone being hung up at the end of the conversation. Clearly, the off-camera conversation had nothing to do with Scurry.

Once the interview began, Scurry recounted how he found Cannon's body. When detectives asked for Scurry's consent to search his phone, the following colloquy ensued:

> [SCURRY]: — (indiscernible). If I say no, then what'll happen if I say no (indiscernible) consent, though?
>
> UNIDENTIFIED SPEAKER: I mean, . . . they're going to apply for a search warrant anyway.
>
> [SCURRY]: (Indiscernible).
>
> UNIDENTIFIED SPEAKER: (Indiscernible) search warrant, but that—obviously, that (indiscernible). I know you had mentioned you wanted your phone back right away.
>
> [SCURRY]: Yeah.
>
> UNIDENTIFIED SPEAKER: And, you know, (indiscernible) willing to give you, you know, (indiscernible).
>
> It's up to you. I'm just trying (indiscernible) to get your phone (indiscernible).
>
> [SCURRY]: If I say no, (indiscernible) keep me here until—

UNIDENTIFIED SPEAKER: Well, (indiscernible) keep the phone (indiscernible) apply for a full search warrant and get that information off of there.

Scurry consented to a search of his phone, signed a consent form, and gave detectives his passcode.

Officer Stadnick's police report did not designate Scurry as either a witness or a suspect, and instead denoted him in an "other" category. The officer explained this was because Scurry had not witnessed the actual crime and, at the time, "wasn't anything other than somebody on scene that I spoke with." Likewise, Detective Martinez testified he did not consider Scurry a suspect at the time, but only a witness who had discovered the body. Scurry was not under arrest at the time of the interview.

The trial judge credited the testimony of the State's witnesses. He found the "objective facts of this case at the time of the questioning" did not "lead to a conclusion that [Scurry] was a natural suspect." Scurry's romantic relationship with Cannon had already terminated, they no longer lived together, and Scurry was in a relationship with Green. He went to Cannon's house with Green; Green was the one who called 9-1-1; and Scurry waived down police after he discovered Cannon's body. Further, at the time of the interview, there was no physical evidence linking Scurry to the murder.

13

The judge concluded Scurry was not in custody at the time of the interview. Moreover, the detectives' questions were not coercive, but intended to record Scurry's account, which he had already provided at the scene. He concluded Scurry validly consented to the search of his phone and never revoked his consent.

The judge's finding Scurry was not in custody was sound and supported by the credible evidence in the record. For these reasons, Scurry's argument the text messages retrieved from his phone were fruit of the poisonous tree also fails.

Separately, Scurry argues for the first time on appeal, that he felt pressured to consent to the search, because he was led to believe that, absent his consent, he would not be permitted to leave until detectives had secured a warrant. Consent to search must be voluntary. State v. Maristany, 133 N.J. 299, 305 (1993). Consent must be given "with a free and unconstrained will . . . that is not overborne by physical or psychological duress or coercion," State v. Carvajal, 202 N.J. 214, 226 (2010). The voluntariness of consent is viewed within the totality of the circumstances, including whether the individual was already arrested or handcuffed, "consent was obtained despite a denial of guilt" or "only after the accused had [already] refused initial requests for consent to

search," or "consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered . . . ." State v. King, 44 N.J. 346, 352-53 (1965).

The record shows Scurry voluntarily consented to the search. There is no evidence detectives coerced or manipulated him by answering his question about what would happen if he declined to grant consent to search his phone. The totality of the circumstances does not show his consent was undermined. There were no threats, and Scurry was neither arrested nor handcuffed, and he was free to leave.

## II.

"We defer to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). "We will not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)). Reversal of a conviction is only warranted when a mistaken evidentiary ruling has the "clear capacity to cause an unjust result . . . ." Ibid.

## A.

For the first time on appeal, Scurry contends he was denied the right to a fair trial when the court permitted the State to impeach Brown with her prior

inconsistent statement. He argues the court erred by not holding a <u>Gross</u>[2] hearing to establish the statement's reliability.

A prior inconsistent statement may be admitted for impeachment purposes and as substantive evidence, provided the witness is available for cross-examination. <u>Id.</u> at 8. Under N.J.R.E. 607(a)(2), "[t]he party calling a witness may not neutralize the witness' testimony by a prior contradictory statement unless the statement is in a form admissible under <u>Rule</u> 803(a)(1) . . . ." Admissibility of a prior inconsistent statement under N.J.R.E. 803(a)(1) must be determined at a N.J.R.E. 104 hearing outside the presence of the jury. <u>State v. Baluch</u>, 341 N.J. Super. 141, 179 (App. Div. 2001). "[T]he purpose of the [N.J.R.E. 104] inquiry 'is not to determine the credibility of the out-of-court statements' but 'whether the prior statement was made or signed under circumstances establishing sufficient reliability that the factfinder may fairly consider it as substantive evidence.'" <u>State v. Spruell</u>, 121 N.J. 32, 46 (1990) (quoting <u>State v. Gross</u>, 216 N.J. Super. 98, 110 (App. Div. 1987)). The burden rests with the proponent of the statement to prove its reliability by a preponderance of the evidence. <u>Gross</u>, 121 N.J. at 15-16.

---

[2] <u>State v. Gross</u>, 121 N.J. 1 (1990).

Reliability is determined in light of any relevant surrounding circumstances, including:

> (1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion or a summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures, inducements or coercion for the making of the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement and (15) the presence or absence of corroborating evidence.

> [Id. at 10 (quoting Gross, 216 N.J. Super. at 109-10).]

Brown gave a statement to police memorializing her version of the events of the evening of the murder, after she was Mirandized and waived her rights. She told police she dropped Scurry off at Green's house, Clark exited the car as well and had a brief conversation with Scurry, then Clark asked Brown to drive him to another Wawa. When Clark changed his mind, she made a U-turn while

17

halfway over the bridge, and she saw Clark throw an object out of the car window as if aiming for the water below.

When Brown testified at trial, she stated Clark exited the car with Scurry at Green's house for "only like two seconds" and denied she had witnessed the two having any conversation, because she was not paying attention. When the prosecutor refreshed Brown's recollection with her prior statement, she then said at most Scurry and Clark "said bye to each other" and "that was it."

Brown also testified she had turned around before even reaching the bridge, but then eventually acknowledged she made a U-turn in the middle of the bridge when reminded about her prior statement. She denied having seen Clark "do anything" at that point. When confronted with her statement, she admitted she told police she had seen Clark reach out the window, but denied seeing him throw anything, and questioned the accuracy of the transcript of her statement to police.

Brown also testified she told police the object Clark threw was "small" and assumed it might have been a cigarette or similar object. On cross-examination she stated Clark had thrown something "out the window" but not "over the bridge."

A-5102-18

The next day of trial, the State sought to admit Brown's recorded statement. The court held a hearing to determine the statement's admissibility. Defense counsel argued the State's introduction of the recorded statement, after Brown had already left the stand, deprived the defense of its Sixth Amendment right to further cross-examine her about the statement.

The trial judge concluded the statement was admissible both for impeachment purposes and as substantive evidence, under N.J.R.E. 803(a)(1) and N.J.R.E. 607. He reasoned as follows:

> The prior statement would be admissible if made by the witness while testifying—that's satisfied; two, that the maker of the statement is called as a witness before the jury and is available for cross-examination—that was satisfied, she was called; and three, that the prior statement is made under circumstances establishing its reliability and is either contained in a sound recording, or contained in a writing made by or signed by the witness—my understanding [is] this is a video recording of the witness's statement; it's admissible.

The judge noted: Brown had denied portions of the statement when the State confronted her with it; defense counsel already had the opportunity to cross-examine her in that regard; and the defense would be permitted to recall her if further cross-examination was necessary.

Portions of the recording were played for the jury during Detective Martinez's testimony. In the judge's final jury instructions, he explained at some

19

length how the jury could consider the prior statement in connection with Brown's testimony.

On appeal, Scurry does not challenge the admission of the prior statement on confrontation grounds. Instead, he argues the failure to hold a <u>Gross</u> hearing to determine the statement's reliability prior to admission—and the failure to give an appropriate limiting instruction requiring the jury to evaluate the statement pursuant to the same standard for reliability—is reversible error. He questions whether the statement was inconsistent, noting Brown neither "disavow[ed]" it nor denied recalling having made it. Scurry argues the statement was highly prejudicial because it suggested he had given Clark the murder weapon that was later found in the river and colluded with Clark to dispose of the weapon.

We are unpersuaded by these arguments. At the outset, there was no claim asserted before the trial judge that the statement was unreliable. Therefore, a <u>Gross</u> hearing was not required. Scurry's brief does not apply the <u>Gross</u> factors to the circumstances in which Brown gave her statement. Even so, we are not convinced Brown's statement would be declared unreliable under the fifteen <u>Gross</u> factors.

Indeed, factors one, two, three, and six do not favor Scurry. Brown was Mirandized before she gave the statement. There is no assertion the Miranda rights were invalid, or that her statement was involuntary, or that Brown did not understand the reasons she was being questioned, thereby satisfying factors four, nine, twelve, and thirteen. Factors five, seven, and eight are not applicable. Factor ten is satisfied because the recording of her statement is complete. Factors eleven and fourteen do not favor Scurry because there is no indication Brown was motivated to fabricate her statement, or that it was not inherently believable. Additionally, factor fifteen was met because her trial testimony corroborated much of her statement; a gun was found in the river, and a license plate reader captured her car in the vicinity of the bridge, also corroborating her statement.

Brown's statement to police was plainly inconsistent with her testimony. The judge did not abuse his discretion by admitting the statement. The defense had an opportunity to cross-examine Brown and was not barred from recalling her. Additionally, the judge instructed the jury on how to treat the prior inconsistent statement, namely, to judge credibility and treat it as substantive evidence. The judge's instruction detailed at length how the jury must consider

21

the totality of the circumstances surrounding Brown's prior statement and her testimony.

We affirm the judge's decision to admit Brown's prior statement for the reasons he expressed following the evidentiary hearing. The admission of Brown's prior inconsistent statement was not reversible error.

B.

For the first time on appeal, Scurry asserts he was deprived of an opportunity to present evidence of third-party guilt. He claims the judge erred when he prohibited the defense from questioning Thompson in a manner that would have implicated Thompson in the murder.

Both the federal and state constitutions "guarantee criminal defendants 'a meaningful opportunity to present a complete defense'" to the charges against them. State v. Garron, 177 N.J. 147, 168 (2003) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986); State v. Budis, 125 N.J. 519, 531 (1991)). Essential to that opportunity is a right to introduce evidence of third-party guilt. State v. Cotto, 182 N.J. 316, 332 (2005). Evidence of a third party's guilt need not substantially prove the guilt of the third party to warrant admission, but "need only be capable of raising a reasonable doubt of [the] defendant's guilt . . . ." State v. Fortin, 178 N.J. 540, 591 (2004) (quoting State v. Koedatich, 112 N.J.

22

225, 299 (1988)). However, the evidence of third-party guilt must have more than a speculative connection to the case, and "must be capable of demonstrating 'some link between the [third-party] evidence and the victim or the crime.'" State v. Perry, 225 N.J. 222, 239 (2005) (alteration in original) (quoting Koedatich, 112 N.J. at 301).

Thompson testified about his prior criminal record and admitted on cross-examination he once owned a .22 caliber gun but denied owning other guns. Defense counsel impeached Thompson, showing he was previously convicted for possession of .38 caliber hollow-point bullets, and then asked him about the .38 gun itself. Thompson replied the gun was "long gone." Defense counsel also asked him about his other convictions, including one for aggravated assault.

Following a brief redirect examination by the State, defense counsel sought to re-cross-examine Thompson regarding the details of his aggravated assault conviction. The defense intended to show that if Thompson shot someone[3] with a .38 caliber weapon, it would further undermine his credibility given his testimony that he had only ever owned the .22 caliber weapon. However, the judge denied defense counsel's request, reasoning that only

---

[3] At sidebar, both counsel and the court recalled Thompson having volunteered on re-direct that he had "shot somebody," but that testimony is not evident from the transcript.

Thompson's convictions were relevant for impeachment purposes, not the underlying circumstances. Moreover, the testimony was redundant because the defense already impeached Thompson on this point.

Although the defense's challenge at trial was on impeachment grounds, on appeal Scurry now claims he was deprived of the ability to show third-party guilt. He asserts the circumstances underlying the prior conviction, to the extent it entailed a shooting, would have shown Thompson had a propensity to commit the murder. Because Scurry never raised this issue at trial, we review the trial judge's ruling for plain error to see if it was "clearly capable of producing an unjust result." R. 2:10-2.

This argument lacks merit. Cannon was murdered with a nine-millimeter gun. Therefore, evidence of Thompson's prior use of a different sort of weapon bears no obvious connection to this case, invites speculation, and would only serve to confuse the jury.

Moreover, defense counsel was afforded considerable leeway to explore third-party guilt with Thompson. Counsel asked Thompson on cross-examination whether he had killed Cannon and questioned him regarding his: gun ownership; knowledge Cannon had considered terminating her pregnancy;

involvement in another romantic relationship at the time of the murder; and whether he was jealous when Ramsey visited Cannon.

Defense counsel also questioned detectives about their reasons for excluding Thompson as a suspect. Counsel elicited testimony from detectives directly bearing on propensity and third-party guilt, namely, a prior accusation that Thompson had held a gun to a woman's head.

We are satisfied the trial judge did not abuse his discretion by limiting the re-cross-examination of Thompson. The judge's exercise of discretion limiting a line of questioning, which at best was tenuous, was not clearly capable of producing an unjust result.

## C.

Scurry argues the judge abused his discretion by permitting the State to introduce the still image from the video on his phone showing a nine-millimeter handgun near him. He asserts the evidence should have been excluded as "other crimes" evidence.

Other crimes evidence may be admitted for purposes other than to prove disposition, including to establish "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." N.J.R.E. 404(b). However, other

crimes evidence has a "unique tendency" to prejudice jurors, State v. Stevens, 115 N.J. 289, 302 (1989), by influencing them to convict a defendant "not on the evidence of the specific crime at issue but because of the perception that the defendant is a 'bad' person in general." State v. Gibbons, 105 N.J. 67, 77 (1987).

Therefore, such evidence is admitted only with great caution. State v. Willis, 225 N.J. 85, 97 (2016). Evidence of a prior bad act is admissible only if (1) it is "relevant to a material issue" in the case, (2) the prior act is "similar in kind and reasonably close in time to the offense charged[,]" (3) the evidence of the prior act is clear and convincing, and (4) its probative value is not "outweighed by its apparent prejudice." State v. Cofield, 127 N.J. 328, 338 (1992) (quoting Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence, 38 Emory L.J. 135, 160 (1989)). Additionally, the court must issue a careful, precise limiting instruction to the jury regarding the appropriate use of the evidence in its deliberations. Id. at 340-41.

"The threshold determination under Rule 404(b) is whether the evidence relates to 'other crimes,' and thus is subject to continued analysis under Rule 404(b), or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy, most importantly Rule 403." State v. Rose, 206 N.J. 141, 179 (2011). Evidence is intrinsic "if it

'directly proves' the charged offense.  . . . If uncharged misconduct directly proves the charged offense, it is not evidence of some 'other' crime." Id. at 180 (quoting United States v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010)).  Also, "'uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime.'  But all else must be analyzed under Rule 404(b)." Ibid.

Scurry moved in limine to exclude the still image on grounds it was irrelevant, highly prejudicial, and improper other crimes evidence.  Following an evidentiary hearing, the judge concluded the evidence was intrinsic.  Pursuant to Cofield, he reasoned there were distinctive features visible both in the image and the gun recovered from the river to enable a jury to conclude the weapons were the same.  The judge found the image was clear and convincing evidence of Scurry's unlawful possession of a weapon, an offense he was charge with, and the image was made reasonably close in time to the charged offense.  Therefore, the probative value of the image in establishing the relationship between the murder weapon and the gun in Scurry's possession exceeded any prejudice from its admission.  The judge ruled the image would be admitted, subject to a limiting instruction to the jury.

After the State introduced the image, the judge instructed the jury it could consider it "for the purposes of determining whether or not . . . Scurry had access to . . . the weapon in this case." The judge reminded the jury it could consider the still image only for this purpose. If the jury concluded the weapon in the still image was not the same as the murder weapon in evidence, then it could not consider it for any other purpose, and "[c]ertainly not [for] the propensity to have a weapon, or anything else."

We are satisfied the judge's ruling was not an abuse of discretion. The Cofield factors were met. The still image was clearly relevant to whether Scurry unlawfully possessed a weapon, which made the offense similar in kind to the one charge. The image was made close in time to Cannon's murder and was clear and convincing evidence of weapons possession because the gun was lying next to Scurry. Therefore, the probative value outweighed the prejudice. And the jury instruction clearly limited how the jury could use the evidence.

D.

For the first time on appeal, Scurry argues he was denied the right to a fair trial because the officers who testified on behalf of the State identified him in the Wawa surveillance footage. He asserts the testimony impermissibly encroached on the jury's role as factfinder.

28

N.J.R.E. 701 permits lay witness opinion testimony "if it:  (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony in determining a fact in issue."  The purpose of the rule is to "ensure that lay opinion is based on an adequate foundation."  State v. Sanchez, 247 N.J. 450, 466 (2021) (quoting State v. Singh, 245 N.J. 1, 14 (2021)).

A lay witness "need not have witnessed the crime or been present when [a] photograph or video recording was made in order to offer admissible testimony" regarding the identity of an individual in the photograph or recording.  Id. at 469.  The witness need only "have actual knowledge, acquired through his or her senses, of the matter to which he or she testifies.'"  Id. at 466 (quoting State v. LaBrutto, 114 N.J. 187, 197 (1989)).  In Sanchez, an officer was permitted to testify that she identified the defendant in surveillance footage taken shortly after the crimes occurred, because she had met with him on numerous occasions while supervising him on parole and was familiar with his appearance from personal observation.  Id. at 458, 469.

As to the second requirement, assisting the jury to understand a disputed fact, the lay opinion testimony must pertain to a matter about which the jury is not equally "competent as [the witness] to form a conclusion."  Id. at 469-70 (alteration in original) (quoting State v. McLean, 205 N.J. 438, 459 (2011)).  A

29

court should consider the "nature, duration, and timing of the witness's contacts with the defendant" and the extent to which the contact occurred near the time of the offense or permitted the witness to observe aspects of the defendant's appearance that might not be readily observable at trial. Id. at 470-72. Other considerations include if "there has been a change in the defendant's appearance since the offense at issue" to enhance the value of the witness's observations of the defendant closer to the time of the offense, and whether the recording at issue is either so clear, or of such poor quality, that the witness's identification would be unhelpful at best or highly prejudicial at worst. Id. at 472-73. The court may also consider whether any witnesses outside law enforcement would be available to identify the defendant in the same manner at trial. Ibid. Ultimately, admissibility will depend on a consideration of all the relevant circumstances, and no one factor is dispositive. Id. at 473-74.

Scurry argues Officer Vinzinski's and Detective Martinez's testimony—identifying him and describing his clothing while discussing the significance of the surveillance footage they had collected and reviewed during their investigation—was improper lay opinion testimony. Officer Vinzinski testified he reviewed seven hours of surveillance footage from the Wawa, and was "able to identify" Scurry entering the Wawa at 3:22 a.m. He pointed out Scurry in the

video by noting the clothing he was wearing. Officer Vinzinski also recounted collecting and reviewing other footage from a nearby business he believed was on the perpetrator's "possible route of travel," and observed that an individual depicted in the video had a similar "physical build," "appearance," and "clothing" to the individual he had identified as Scurry in the Wawa footage.

Detective Martinez testified he could identify Scurry from the Wawa footage because he had interviewed Scurry a few days prior to viewing the video. The detective also gathered footage from a residence near Cannon's home, which depicted an individual in dark pants and a light-colored sweatshirt moving "away from the scene at a hurried pace," but he could not identify the person.

Defense counsel did not object to this testimony. Regardless, we discern no plainly prejudicial error warranting our intervention because the jury had the opportunity to view the videos and evaluate the credibility of the officers' representations regarding what the videos depicted. Moreover, both officers interacted with Scurry at the scene just hours after the murder occurred and the surveillance footage was captured. Their testimony was rationally based on their personal observation of Scurry and the surrounding facts, including that Brown had placed Scurry at the Wawa. The testimony aided the jury, because it

31

provided context and explained the relevance of the surveillance footage the jury was shown and the overall investigation.

## III.

For the first time on appeal, Scurry argues the judge erred by failing to remind the jury in the final instructions to disregard that he had asserted his right against self-incrimination during police questioning. We discern no reversible error.

A suspect's invocation of the privilege against self-incrimination "cannot be used against [them] in a criminal trial." State v. Muhammad, 182 N.J. 551, 558 (2005). A violation of this right at trial may be cured with a timely, appropriate instruction to the jury. State v. Scherzer, 301 N.J. Super. 363, 441 (App. Div. 1997). In this regard, a curative instruction "will not be deemed inadequate" on review "unless there is a real possibility that the error led the jury to a result it otherwise might not have reached." Ibid.

During the defense's cross-examination of Officer Vinzinski about the investigation, counsel asked him whether he had ever spoken with Scurry about having seen Scurry in the Wawa surveillance footage. Officer Vinzinski responded Scurry "requested a lawyer when [the officer] tried to talk to him."

32

The trial judge immediately called a sidebar, and admonished defense counsel for asking a question guaranteed to elicit the problematic response. Defense counsel then requested a mistrial, which the judge denied. The judge and counsel then agreed to instruct the jury to disregard the question and response, because it would be stricken from the record. The judge instructed the jury as follows:

> Whether or not somebody seeks the services of an attorney is a constitutional right. You can infer nothing from that. Do you understand that? So if somebody says or you find out that somebody sought the services of an attorney, you can't consider that at all in any way, shape, or form in your decisions with regards to this case. Do you understand that? So I'm striking that. You're not to consider it at all.

At the close of the case, the final jury instructions reminded the jury it could not consider evidence the judge had stricken. The judge said:

> [A]ny testimony that I may have had occasion to strike is not evidence and should not enter into your final deliberations. And I did do that a couple times, remember? Okay. Now, it must be disregarded by you. This means that even though you may remember the testimony, you are not to use it in your discussions or deliberations.

On appeal, Scurry asserts the failure to repeat the earlier, curative instruction was plain error. This argument lacks merit.

The curative instruction was idiosyncratic of the issue to be resolved, namely, to promptly strike from the record and direct the jury to ignore the improper question and answer. We are unconvinced the jury failed to follow the instruction or that repeating it at the end of the case, e.g., reminding the jury of the stricken evidence, was required under the circumstances. The problematic question and answer were fleeting and not especially egregious. See State v. Feaster, 156 N.J. 1, 77 (1998) (convictions and sentence affirmed due to the "fleeting nature" of "defendant's invocation of his right to counsel"). Moreover, the judge's final instructions reminded jurors they were not to consider any evidence that had been stricken.

IV.

Clark argues the judge should have granted his motion to sever his case from Scurry's. This issue is entrusted to the trial judge's sound discretion and will not be disturbed on appeal absent an abuse of that discretion. State v. Sanchez, 143 N.J. 273, 283 (1996).

A trial judge deciding a motion to sever must "balance the potential prejudice to [a] defendant's due process rights against the State's interest in judicial efficiency." State v. Brown, 118 N.J. 595, 605 (1990) (citing State v. Coleman, 46 N.J. 16, 24 (1965)). "A joint trial is preferable because it fosters

the goal of judicial economy and prevents inconsistent verdicts." State v. Weaver, 219 N.J. 131, 157 (2014).

The test for granting severance is rigorous. Brown, 118 N.J. at 605-06. "The mere existence of hostility, conflict, or antagonism between defendants is not enough." Id. at 606. A mere risk of prejudice is insufficient to warrant severance as the defendant must show actual prejudice. State v. Moore, 113 N.J. 239, 274 (1988). "Separate trials are required only when defendants 'present defenses that are antagonistic at their core.'" Brown, 118 N.J. at 606 (quoting United States v. Berkowitz, 662 F.2d 1127, 1134 (5th Cir. 1981)).

"When [a] defendant's defense strategy is antagonistic at its core to the defense strategy of his co-defendant so that the jury could only believe one of them, severance is in order." Weaver, 219 N.J. at 157. However, "[i]f the jury can return a verdict against one or both defendants by believing neither, or believing portions of both, or, indeed, believing both completely, the defenses are not mutually exclusive." Brown, 118 N.J. at 606.

The trial judge acknowledged Clark was not charged with any offense related to the commission of the killing itself, but found the allegation that Clark hindered the investigation and prosecution of Scurry for the murder was inseparable from Scurry's conduct. Indeed, the evidence of the homicide was

35

integral to the jury's understanding of the hindering case against Clark. The evidence relating to disposal of the weapon was relevant to the prosecution of both cases. The defenses were not antagonistic to one another because neither defendant made a statement implicating the other, and all third-party witness testimony would be admissible in either case. The judge therefore concluded there was no justification for severance that would outweigh the interests of judicial economy.

On appeal, Clark concedes the jury would have to hear at least some evidence of the homicide in his case but argues the level of detail necessary to prove the homicide in Scurry's case pervaded and prejudiced his chances of acquittal at a joint trial. Clark asserts he was merely an "after-the-fact, bit player" in Cannon's murder and the bulk of the evidence relevant to the murder, namely the: abusive texts Scurry sent Clark, crime scene photos of Cannon's body, and evidence showing she was pregnant and her children were home when she was shot, was irrelevant to whether he helped Scurry conceal evidence of the homicide.

The judge did not abuse his discretion. We are unconvinced the jury was unable to parse the evidence as it related to each defendant. Nor does the record convince us the jury was impelled to convict Clark based on Scurry's actions.

The State never alleged, and the evidence presented did not suggest, that Clark played a role beyond the hindering. The judge instructed the jury as to the offenses committed by each defendant and Clark does not challenge those jury charges. We must presume the jury followed the judge's instructions. State v. Martini, 187 N.J. 469, 477 (2006) (citing State v. Marshall, 173 N.J. 343, 355 (2002)).

Clark's reliance on State v. Savage, 198 N.J. Super. 507, 508-09, 513 (Law Div. 1984), is misplaced. Savage, also involved one defendant charged with murder and another charged with hindering apprehension after the fact, but not the murder itself. Id. at 513. However, severance was granted in Savage because it was a capital murder case involving the selection of a "death qualified" jury, for whom the selection process was different. Id. at 509. In such cases, jurors could convict a defendant, but then decline to hear the death penalty phase of the case. Ibid. Therefore, the court found "if death qualification followed the guilt phase, it is possible that not enough jurors would remain to hear the penalty phase due to their absolute views for or against the death penalty . . . ." Ibid. Severance was required because the possibility that the same jury would not hear all phases of the cases was contrary to "legislative

policy favoring trial of all phases of a capital case before the 'same jury' . . . ." Id. at 510.

Savage is inapposite. The offenses charged here were different and the jury selection process for each defendant was not unique to their offenses.

We also reject Clark's reliance on State v. Sterling, 215 N.J. 65, 73 (2013). That case involved the severance of charges against a single defendant who committed multiple criminal transactions. Ibid. The concern there was the "danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all." Ibid. (quoting State v. Pitts, 116 N.J. 580, 601 (1989)). The offenses here were committed by two defendants within the context of one broad criminal transaction.

## V.

Clark asserts the judge should have granted his post-trial motion for a judgment of acquittal on the unlawful possession of a weapon charge. He argues N.J.S.A. 2C:39-2(b), which permits the jury to draw an inference that defendant did not have a firearm permit unless the defendant establishes otherwise, was

unconstitutional as applied here because the State failed to introduce any evidence showing he lacked a permit.

A post-trial motion for judgment of acquittal is governed by Rule 3:18-2. The motion judge may consider all the evidence, direct or circumstantial, presented by the State and the defendant, giving the State the benefit of all the favorable evidence and all the favorable inferences drawn from that evidence, and then determine whether a reasonable jury could find guilt beyond a reasonable doubt. State v. Lodzinski, 249 N.J. 116, 144 (2021); State v. Fuqua, 234 N.J. 583, 590-91 (2018); State v. Williams, 218 N.J. 576, 594 (2014). "The evidence should be sifted to determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present." State v. Carter, 91 N.J. 86, 96 (1982). A court must recognize "jurors 'may draw an inference from a fact whenever it is more probable than not that the inference is true . . . .'" Lodzinski, 249 N.J. at 144 (quoting State v. Brown, 80 N.J. 587, 592 (1979)). We apply the same standard on appellate review. Id. at 145.

N.J.S.A. 2C:39-5(b)(1), criminalizes the unlawful possession of a weapon, which it defines as "[a]ny person who knowingly has in his possession any

handgun . . . without first having obtained a permit to carry the same . . . ."

N.J.S.A. 2C:39-2(b) states:

> When the legality of a person's conduct under this chapter depends on [their] possession of a license or permit or on [their] having registered with or given notice to a particular person or agency, it shall be presumed that [they] do[] not possess such a license or permit or ha[ve] not registered or given the required notice, until [they] establish[] the contrary.

In State v. Ingram, our Supreme Court considered the constitutionality of the statutory presumption under N.J.S.A. 2C:39-2. 98 N.J. 489, 491 (1985). The Court held:

> (1) the absence of a required permit is an essential element of a weapons offense as defined under N.J.S.A. 2C:39-5; (2) once possession of a weapon is shown and an accused fails to come forward with evidence of a permit, the State may employ the statutory presumption of N.J.S.A. 2C:39-2 to establish the absence of the required permit; and (3) a jury should be instructed that although such a statute authorizes the inference that there is no such permit, the ultimate burden of persuasion rests on the State, with the jury being at liberty to find the ultimate fact one way or the other.
>
> [Id. at 500.]

Detective Martinez testified he "personally did not look" for any permits for Clark, but in reviewing the evidence gathered during the investigation he had

not seen any permits. The defense offered no evidence to the contrary. The judge instructed the jury on the inference issue as follows:

> The third element the State must prove beyond a reasonable doubt is that the defendant did not have a permit to possess such a handgun. If you find the defendant knowingly possessed the handgun and there is no evidence that the defendant had a valid permit to carry such a handgun, then you may infer, if you think it appropriate to do so, based upon the facts presented, that defendant had no such permit.
>
> Know however, as with all other elements, the State bears the burden of showing beyond a reasonable doubt the lack of a valid permit, and that you may draw the inference only if you feel it is appropriate to do so under all the facts and circumstances.

Defense counsel moved for a judgment of acquittal, pointing out the State had offered no substantive evidence bearing on Clark's lack of a permit, and applying the statutory inference would oblige Clark to testify on his own behalf, which was contrary to his right to remain silent. The trial judge denied the motion, reasoning the State could not be expected to prove a negative and could rely on the statutory inference. However, because the State had the burden of proof, the jury would be free to accept or reject the inference in the context of its evaluation of the evidence.

Giving the State the favorable inference, it is clear the jury accepted Detective Martinez's testimony the evidence gathered during the investigation

41

revealed no gun permit for Clark. It is also obvious the jury properly applied the jury instruction regarding the statutory inference. As the judge aptly noted, the State was not required to do more to invoke the statutory presumption. We discern no error.

## VI.

### A.

Finally, both defendants challenge their sentences. Sentencing decisions are discretionary in nature. State v. Cuff, 239 N.J. 321, 347 (2019). Therefore, we review for an abuse of discretion. State v. Jones, 232 N.J. 308, 318 (2018). We defer to the sentencing court's factual findings and should not "second-guess" them. State v. Case, 220 N.J. 49, 65 (2014).

"To facilitate meaningful appellate review, trial judges must explain how they arrived at a particular sentence." Ibid. We will reverse a sentence where: the findings of fact on the aggravating and mitigating factors were not based on competent and credible evidence in the record; the court applied the incorrect sentencing guidelines enunciated in the criminal code; or the application of the facts to the law constituted such an error of judgment as to shock the judicial conscience. State v. Roth, 95 N.J. 334, 363-65 (1984).

B.

Scurry asks us to remand his sentence because the trial judge failed to explicitly address the fairness of imposing consecutive prison terms for his first-degree murder and certain-persons convictions as required by State v. Torres, 246 N.J. 246, 270-73 (2021). The State agrees. For these reasons, we remand for a statement regarding the overall fairness of Scurry's sentence as required by Torres.

We add, however, that the judge should also make findings under the State v. Yarbough factors. 100 N.J. 627, 643-44 (1985). There, our Supreme Court held when a court determines whether a sentence should be concurrent or consecutive it should qualitatively weight the following factors:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous . . . .

43

> [Torres, 246 N.J. at 264 (quoting Yarbough, 100 N.J. at 643-44).]

The judge's sentencing in Scurry's case lacks an assessment under Torres and Yarbough. For these reasons, we remand and direct the judge to reconsider Scurry's sentence by making the findings required under Torres and Yarbough. Scurry does not otherwise challenge his sentence. Therefore, our remand is circumscribed.

## C.

Clark argues his sentence was excessive. He alleges the court gave too much weight to aggravating factor three because his criminal record was not substantial. He asserts to the extent the judge's finding of aggravating factor nine relied on Clark's knowledge that the object he threw off the bridge was a gun, the judge impermissibly double-counted elements of the offenses for which he was convicted. He contends his eight-year sentence was unjustified and the judge should have sentenced him to the minimum sentence of five years with forty-two months of parole ineligibility.

The trial judge observed that Clark, at thirty-two years of age, had three arrests as a juvenile, including two diversions and one adjudication, and thirteen arrests as an adult, including five ordinance violations and three disorderly persons convictions. Although the judge noted Clark had no indictable

convictions he nonetheless "had repeated contact with the criminal justice system[.]" Therefore, he found aggravating factor three—the risk he would commit another offense, N.J.S.A. 2C:44-1(a)(3), applied and should be given substantial weight.

The trial judge found aggravating factor nine—the need for deterrence, N.J.S.A. 2C:44-1(a)(9), because even assuming Clark initially believed he was only doing a favor for a friend, he knowingly accepted the gun, with knowledge of Scurry's criminal background. The judge noted Clark was friends with Scurry and knew him for "a good portion of his life. He knows he's had a murder charge before. . . . He knows he has an extensive criminal record, and he asked the jury to believe, which they did not believe, that he handed him a package. And he had no idea what was in there." The judge found:

> Under the circumstances, as we know them, there's no way he didn't know that was a gun. Zero. No way.
>
> . . . .
>
> So what . . . is that saying about . . . the risk associated with this individual and the need for deterrence. That's the moment of nope. I'm not doing that. . . .
>
> So even if he was willing to drive him here and drive him there at all ungodly hours of the morning, . . . the decision to take the gun from him, that's a

45

nonstarter. That's where deterrence comes in, because at some point, no matter who it is, you say no, and that's where deterrence comes in.

The trial judge found no mitigating factors and concluded the aggravating factors clearly preponderated.

As we noted, the judge sentenced Clark to an eight-year term, subject to a four-year period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), on the unlawful possession count, concurrent to a flat four-year term on the hindering count. He then merged the remaining counts into the unlawful possession count and imposed appropriate fines and penalties.

Clark's sentence was not an abuse of discretion. Both aggravating factors were supported by the evidence in the record. The judge did not double-count Clark's offense when he found aggravating factor nine. Although the judge found Clark could not credibly claim ignorance that the object he disposed of was a gun, the reasons for applying aggravating factor nine did not hinge on the gun possession. Rather, the judge was pointing out Clark's willingness to commit the offenses given the circumstances.

Clark received the midrange sentence on the unlawful possession count. See N.J.S.A. 2C:43-6(a)(2) (sentencing range of between five and ten years for second-degree offense). The sentence does not shock our judicial conscience.

Affirmed in part and remanded in part in A-5102-18.  Affirmed in A-2666-20.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5102-18